UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| KURT WEST,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>BELL HELICOPTER TEXTRON, INC., CIRCOR AEROSPACE, INC., COLTEC INDUSTRIES INC., GOODRICH CORPORATION, AND ROLLS-ROYCE CORP.<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

This action involves the uncommanded shutdown of a Bell 407 Helicopter while in flight on December 22, 2008, resulting in physical injury, pain and suffering, and emotional injury and distress to the pilot, plaintiff Kurt West, when the helicopter crashed in Bow, New Hampshire on a repositioning flight from Connecticut to New Hampshire ("the Accident"). An "uncommanded" action is one in which the pilot played no role, and in this and many instances, an action commanded by a malfunctioning computer system.

**Parties**

1.  Plaintiff Kurt West ("Plaintiff" or "West") is a licensed commercial helicopter pilot who resides in Boston, Suffolk County, Massachusetts. West is employed as a helicopter

pilot by JBI Helicopters ("JBI") of Pembroke, New Hampshire. JBI hangars, services, and provides pilots for various privately owned helicopters.

2. Defendant Bell Helicopter Textron, Inc. ("Bell Helicopter") is the manufacturer of several models of helicopters for both military and civilian use, including a model known as the Bell 407. Bell Helicopter's principal place of business is in Hurst, Texas. Bell Helicopter is registered to do business in New Hampshire, and the accident giving rise to this lawsuit occurred in New Hampshire.

3. Goodrich Corporation ("Goodrich") is the manufacturer of the Electronic Control Unit ("ECU") that controls multiple critical functions on the helicopters in which it is installed, including the Bell 407, as part of the Full Authority Digital Engine Control ("FADEC"). Goodrich's principal place of business is in Charlotte, North Carolina. Goodrich is registered to do business in New Hampshire, and the accident giving rise to this lawsuit occurred in New Hampshire.

4. Coltec Industries Inc. ("Coltec"), including its Chandler Evans Division, is the manufacturer of the FADEC system on the Bell 407, including the Chandler Evans EMC-35 fuel pump, which system incorporates Goodrich's ECU. Coltec also manufactures the Hydromechanical Unit ("HMU") on the Bell 407, which interfaces with the FADEC to control the flow of fuel to the engine. Coltec merged with B.F. Goodrich Co., a predecessor-in-interest to Goodrich, in or about 1999 but is still incorporated as a separate company in Pennsylvania. Coltec's principal place of business is in Charlotte, North Carolina. Coltec's registration to do business in New Hampshire is currently suspended, but the accident giving rise to the lawsuit occurred in New Hampshire.

5. Circor Aerospace, Inc., d/b/a/ Circle Seals Control, ("Circor") manufactures the fuel shut-off valve used in the Bell 407 engine. Circor's principal place of business is Corona, California. Circor is not presently registered to do business in New Hampshire, but the accident giving rise to the lawsuit occurred in New Hampshire.

6. Rolls-Royce Corporation ("Rolls-Royce") manufactures the engines and selects component parts for use in those engines, including in the FADEC, which itself includes the ECU, for the Bell 407. Rolls-Royce's principal place of business is in Indianapolis, Indiana. Rolls-Royce is registered to do business in New Hampshire, and the accident giving rise to this lawsuit occurred in New Hampshire.

7. On December 31, 2008, six business days after the Accident, Goodrich and Rolls-Royce Group plc, of which Rolls-Royce Corporation is a part, signed a joint venture agreement to develop and supply engine controls for Rolls-Royce aero engines, including helicopter engines, under the name Rolls-Royce Goodrich Engine Control Systems Limited. On information and belief, Rolls-Royce, Goodrich, and Goodrich-affiliate Coltec were working cooperatively for several years before the formation of the joint venture, with Rolls- Royce using Goodrich Electronic Control Units and Coltec components, including the Chandler Evans EMC-35 Fuel Pump, in the FADEC's of the helicopter engines that Rolls-Royce built for Bell Helicopter.

## Jurisdiction and Venue

8. Jurisdiction properly rests in the Federal court pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because the Accident occurred here.

## Preliminary Allegations Applicable to All Counts

10. West has held a helicopter pilot's license since the late 1990's, has flown professionally from that time to the present, and holds an FAA-issued First Class Medical Certificate.  He is an experienced and well-qualified pilot who attends Bell Helicopter's pilot training program annually and intermittent other training programs as appropriate. West was involved in no accidents or incidents before the Accident.

11. On December 22, 2008, West was repositioning a Bell 407 helicopter, tail number N407GB, owned by Speedway Aviation, LLC and managed by JBI from a general aviation airfield in Danielson, Connecticut, where it had been flown two days earlier by a different pilot, to the JBI hangar in Pembroke, New Hampshire.  Before departing from Connecticut, West and another JBI employee carefully removed all snow and ice from the craft and tested its systems for flight.  The Bell 407 is marketed for use in snowy and icy environments, including environments as extreme as the Arctic, and is easily able to sustain outdoor overnight storage in winter conditions such as those on December 21 and 22, 2008.

12. West flew the Bell 407 helicopter, without passengers, from Connecticut without incident or problem for approximately forty-five minutes, by which time the craft was over Bow, New Hampshire.  Shortly after 4 p.m., approximately 3.5 miles southwest of the destination field in Pembroke, West began the descent and slowed his rate of approach.  At approximately 4:04 p.m., at an altitude of about 500 feet and a rate of speed less that 5 miles per hour, an uncommanded shutdown of the engine occurred.  For unexplained reasons and without pilot direction, the fuel to the engine was shut off with no warning lights on the caution warning

advisory panel, with the FADEC still in automatic mode, and with no premature yawing or noises.  The fuel on board, at 439 pounds, was more than adequate for the continued operation of the aircraft.

13. When the uncommanded shutdown occurred, West managed with substantial difficulty to employ the manual device intended as an emergency back-up in the event of engine failure to reduce the speed of the free-fall and to avoid hitting houses or a near-by school. Although in a state of extreme fear and distress and while subject to substantial gravitation pull, West was able to autorotate the craft to a hard landing, at an estimated impact level of 10g's, on Whittier Drive in Bow.

14. On information and belief, the uncommanded shutdown was the product of a failure of the FADEC ECU software, i.e., a malfunctioning in which the computer seized control of the engine and directed a stoppage of fuel flow to the engine and malfunctioning of the HMU and fuel shut-off valve.  Such a scenario is supported by the pilot's observations, the findings upon inspection after the Accident, the exclusion of other possible causes during the course of such inspections, the history of the Rolls-Royce engine ECU, and subsequent events of a similar nature.  Such a scenario is further supported by the October 2009 observation of a Bell Helicopter representative that the ECU and the HMU "do strange things from time to time."

15. In 2003 the ongoing investigation into a fatal crash of a Bell 407 helicopter following a loss of engine power prompted the National Transportation Safety Board ("NTSB") to ask the Federal Aviation Administration ("FAA") to address an allegedly "catastrophic failure mode" with the FADEC system in the Bell 407's.

16. On March 17, 2003 and again on July 30, 2003, Rolls-Royce issued a Commercial Engine Bulletin relating to the release of Revision 1, followed by Revision 2, of the

ECU in its helicopter engines.  The July 30, 2003 revision for the Bell 407 helicopter ECU, is designated as EMC-35A and bears PIN or part # 23072790.  Bell Helicopter followed up on the Rolls-Royce July 30, 2003 revision by issuing an Alert Service Bulletin on September 4, 2003 for all Bell 407 helicopters providing instructions with regard to installing the new ECU with part #23072790.

17.     The Bell 407 helicopter involved in the Accident was manufactured and sold in 2003.  The ECU part number at the time of the Accident was #2307290, the new version as of July 30, 2003.  The Bell 407 involved in the Accident was probably among the first Bell 407's in which Rolls-Royce employed the new ECU #23072790 .

18.     ECU #2307290 did not correct, or at least did not fully correct, the "catastrophic failure mode" referenced by the NTSB in its 2003 inquiry to the FAA.  In January of 2007, Rolls-Royce issued a Commercial Engine Bulletin entitled "Engine, Fuel and Control – Introduction of Reversionary Governor Electronic Control Unit (ECU)."  In that Bulletin, Rolls-Royce directed that a new Reversionary Governor ECU, designated EMC-35R, be substituted for several ECU's then in use, including #2307290.  Rolls-Royce stated that the introduction of the Reversionary Governor ECU was in order to reduce incidences described as "reversion to manual mode," i.e., uncommanded instructions by the ECU/FADEC to switch the operation from an automatic setting designed to ensure fuel efficiency and other optimum performance, to a manual mode in which all instructions, including fuel flow, must come from the pilot.  Rolls-Royce announced further revisions to the Reversionary Governor ECU on December 5, 2008, sixteen days before the Accident, and on March 16, 2009, twelve weeks after the Accident.  In each instance, Rolls-Royce made it clear that it was continuing to address the problem of the ECU issuing an uncommanded order to switch from automatic to manual operations mode.

19. When the first responders arrived moments after the Accident, they found West unconscious on the ground next to the badly damaged helicopter.

20. West thereafter regained consciousness while an in-patient at Concord Hospital, where he was examined, observed and treated as an in-patient for blunt force trauma. Since that time, West, who suffered from a significant preexisting medical condition relating to his stomach and intestines, has treated with his own physicians and undergone various medical procedures and treatments to address a number of significant medical issues. West also continues to experience emotional consequences from the trauma suffered in the Accident.

21. The helicopter was removed by a boom truck on a low bed trailer to Sharkey's Helicopters, Inc. in Lebanon, New Hampshire, where an expert in helicopter maintenance and repair found, *inter alia*, no problem with fuel quantity, quality or pressure, no obstructions or debris in the particle separator inlet or particle separator window, and the pilot's throttle in the "fly" position. Uncommanded shutdowns that are the product of a maintenance, repair or environmental circumstances such as moisture in the fuel or air in the fuel line leave residual signs, which the examiner found were not present after the Accident. In addition, the engine cannot generally simply be turned back on after the helicopter has crash-landed if the cause for the uncommanded shut-down was maintenance, repair or environmental factors. The examiner was able to power up the helicopter on the ground without difficulty. The examiner stated that he did not know after examination and testing "why this helicopter experienced an uncommanded shutdown."

22. Although the investigators at the National Transportation Safety Board have yet to issue their findings in connection with the Accident, they have informed West and JBI that the accident was not the result of pilot error.

23. The Bell 407 involved in the accident hit with such force (an estimated 10g's) that it was substantially damaged, such that the estimated costs of repair are in excess of $2.2 million. At the time of the crash, the helicopter had been properly serviced and maintained, and was at the low end of the typical range of flight hours for a Bell 407.

24. On December 25, 2009, another Bell 407 equipped with a Goodrich ECU and Rolls-Royce engine, in this case owned and operated by a medical transport service known as Air Evac, experienced a similar uncommanded shutdown in Decatur, Texas. The helicopter crash landed; and, as in the instant case, the engine did not relight until the craft was on the ground, notwithstanding that the fuel valve was in the appropriate fully open position when the shutdown occurred in the air. On information and belief, that incident also resulted from an uncommanded shutdown ordered by the ECU, and the pilot has also been informed that the NTSB has found no pilot error.

25. On May 11, 2010, another Bell 407, in this case owned and operated by the Virginia State Police, experienced a similar uncommanded shutdown just outside of Bristol, Virginia. The helicopter crash landed; and, on information and belief, the engine was able to relight once it was on the ground. On information and belief, that incident also resulted from an uncommanded shutdown, caused by a component part in the Rolls Royce engine, likely either the ECU or the FADEC.

26. On information and belief, other incidents have also occurred involving the same ECU model in Rolls-Royce engines operating Bell 407 model helicopters manufactured by Bell Helicopter.

27. The Bell 407 is flown by a number of public service agencies, including the FBI and several state police forces, and is marketed by Bell Helicopter toward law enforcement and EMS responders.

28. After the Accident, Goodrich removed the ECU for testing, and purportedly could not determine the cause of the Accident.

29. After the Accident, Rolls-Royce removed the engine for testing, and purportedly could not determine the cause of the Accident.

30. Helicopter engines are not designed or intended to turn off in flight uncommanded by the pilot.

31. ECU's in helicopter engines are not designed or intended to order the engine to shut down in flight uncommanded by the pilot.

**Count I:  Breach of Warranty Against Bell Helicopter**

32. Plaintiff incorporates the allegations in paragraphs 1 through 31 as if set forth here in their entirety.

33. Bell Helicopter warranted, impliedly and expressly, that its aircraft would be safe and suitable for transporting a pilot and passengers.  By necessary implication, Bell Helicopter warranted that its aircraft, including the Bell 407 involved in the Accident, was suitable for its intended purpose, to wit, flight, and therefore would not experience uncommanded shutdowns, such that the craft would no longer be capable of flight.

34. As a pilot engaged and authorized by the owner to fly the Bell 407 involved in the Accident, Plaintiff was a beneficiary of Bell Helicopter's express and implied warranties. Bell Helicopter breached its implied and express warranties to Plaintiff, including the warranty

of suitability for a particular purpose, to wit, flight, when the craft experienced an uncommanded shutdown resulting in the Accident.

35.     Plaintiff has experienced, and continues to experience, significant physical and emotional injuries as a result of Bell Helicopter's breach of its express and implied warranties.

### Count II:   Breach of Warranty Against Goodrich

36.     Plaintiff incorporates the allegations in paragraphs 1 through 35 as if set forth here in their entirety.

37.     Goodrich warranted, impliedly and expressly, that its ECU would be safe and suitable for providing system commands to the engines of aircraft in which it was installed, including Bell 407 helicopters, and more particularly including the Bell 407 helicopter involved in the Accident.  By necessary implication, Goodrich warranted that its ECU, including the ECU involved in the Accident, was suitable for its intended purpose, to wit, to provide appropriate system commands, and therefore would not order engine shutdowns, such that the craft would no longer be capable of flight.

38.     As a pilot engaged and authorized by the owner to fly the Bell 407 involved in the Accident, Plaintiff was a beneficiary of Goodrich's express and implied warranties. Goodrich breached its express and implied warranties to Plaintiff, including the warranty of suitability for a particular purpose, to wit, providing appropriate system commands, when the craft experienced an uncommanded shutdown resulting in the Accident.

39.     Plaintiff has experienced, and continues to experience, significant physical and emotional injuries as a result of Goodrich's breach of its express and implied warranties.

### Count III: Breach of Warranty Against Rolls-Royce

40. Plaintiff incorporates the allegations in paragraphs 1 through 39 as if set forth here in their entirety.

41. Rolls-Royce warranted, impliedly and expressly, that its engine and its component parts would be safe and suitable for powering the aircraft in which it was installed, including Bell 407 helicopters, and more particularly including the Bell 407 helicopter involved in the Accident. By necessary implication, Rolls-Royce warranted that its engine and its component parts, including the engine and component parts involved in the Accident, were suitable for their intended purpose, to wit, to power the craft and allow it to remain in flight, and therefore would not experience uncommanded shutdowns, such that the craft would no longer be capable of flight.

42. As a pilot engaged and authorized by the owner to fly the Bell 407 involved in the Accident, Plaintiff was a beneficiary of Roll-Royce's express and implied warranties. Rolls-Royce breached its express and implied warranties to Plaintiff, including the warranty of suitability for a particular purpose, to wit, to power the craft and allow it to remain in flight, when the craft experienced an uncommanded shutdown resulting in the Accident.

43. Plaintiff has experienced, and continues to experience, significant physical and emotional injuries as a result of Rolls-Royce's breach of its express and implied warranties.

### Count IV: Breach of Warranty Against Coltec

44. Plaintiff incorporates the allegations in paragraphs 1 through 43 as if set forth here in their entirety.

45. Coltec warranted, impliedly and expressly, that its FADEC and HMU would be safe and suitable for powering the aircraft in which it was installed, including Bell 407

helicopters, and more particularly including the Bell 407 helicopter involved in the Accident. By necessary implication, Coltec warranted that its FADEC and HMU, including the FADEC and HMU involved in the Accident, were suitable for their intended purpose, to wit, to power the craft and allow it to remain in flight, and therefore would not experience uncommanded shutdowns, such that the craft would no longer be capable of flight.

46. As a pilot engaged and authorized by the owner to fly the Bell 407 involved in the Accident, Plaintiff was a beneficiary of Coltec's express and implied warranties. Coltec breached its express and implied warranties to Plaintiff, including the warranty of suitability for a particular purpose, to wit, to power the craft and allow it to remain in flight, when the craft experienced an uncommanded shutdown resulting in the Accident.

47. Plaintiff has experienced, and continues to experience, significant physical and emotional injuries as a result of Coltec's breach of its express and implied warranties.

**Count V: Breach of Warranty Against Circor**

48. Plaintiff incorporates the allegations in paragraphs 1 through 47 as if set forth here in their entirety.

49. Circor warranted, impliedly and expressly, that its fuel shut-off valve would be safe and suitable for powering the aircraft in which it was installed, including Bell 407 helicopters, and more particularly including the Bell 407 helicopter involved in the Accident. By necessary implication, Circor warranted that its fuel shut-off valve, including the fuel shut-off valve involved in the Accident, were suitable for their intended purpose, to wit, to power the craft and allow it to remain in flight, and therefore would not experience uncommanded shutdowns, such that the craft would no longer be capable of flight.

50. As a pilot engaged and authorized by the owner to fly the Bell 407 involved in the Accident, Plaintiff was a beneficiary of Circor's express and implied warranties. Circor breached its express and implied warranties to Plaintiff, including the warranty of suitability for a particular purpose, to wit, to power the craft and allow it to remain in flight, when the craft experienced an uncommanded shutdown resulting in the Accident.

51. Plaintiff has experienced, and continues to experience, significant physical and emotional injuries as a result of Circor's breach of its express and implied warranties.

### Count VI. Negligent Design and Manufacture Against Bell Helicopter

52. Plaintiff incorporates the allegations in paragraphs 1 through 51 as if set forth here in their entirety.

53. Bell Helicopter designs and manufactures aircraft, including the Bell 407 model, and more particularly including the Bell 407 involved in the Accident. Bell Helicopter has a duty of care to carry out such design and manufacture in a reasonably prudent and careful manner.

54. Because Plaintiff was a pilot engaged and authorized by the owner to fly the Bell 407 helicopter involved in the accident, Bell Helicopter owed that duty of care to design and manufacture the craft in a reasonably prudent and careful manner to Plaintiff.

55. Bell Helicopter breached its duty of care to Plaintiff by negligently designing and manufacturing a craft that experienced an uncommanded shutdown leading to the Accident.

56. Plaintiff was at all times in the exercise of due care.

57. Bell Helicopter's negligence in the design and manufacture of the Bell 407 involved in the Accident was a proximate cause, individually or jointly and severally with the

negligence of Circor, Coltec, Goodrich, and Rolls-Royce, of Plaintiff's injuries. Such injuries were foreseeable in the circumstance of an uncommanded shutdown.

58. Plaintiff has experienced, and continues to experience, significant physical and emotional injuries as a result of Bell Helicopter's negligent design and manufacture of the Bell 407 involved in the Accident.

### Count VII. Negligent Design and Manufacture Against Goodrich

59. Plaintiff incorporates the allegations in paragraphs 1 through 58 as if set forth here in their entirety.

60. Goodrich designs and manufactures ECU's for aircrafts, including the Bell 407 model, and more particularly including the Bell 407 involved in the Accident. Goodrich has a duty of care to carry out such design and manufacture in a reasonably prudent and careful manner.

61. Because Plaintiff was a pilot engaged and authorized by the owner to fly the Bell 407 helicopter involved in the accident, Goodrich owed that duty of care to design and manufacture the ECU in a reasonably prudent and careful manner to Plaintiff.

62. Goodrich breached its duty of care to Plaintiff by negligently designing and manufacturing an ECU that ordered an uncommanded shutdown leading to the Accident.

63. Plaintiff was at all times in the exercise of due care.

64. Goodrich's negligence in the design and manufacture of the ECU involved in the Accident was a proximate cause, individually or jointly and severally with the negligence of Bell Helicopter, Circor, Coltec, and Rolls-Royce, of Plaintiff's injuries. Such injuries were foreseeable in the circumstance of an uncommanded shutdown.

65. Plaintiff has experienced, and continues to experience, significant physical and emotional injuries as a result of Goodrich's negligent design and manufacture of the ECU involved in the Accident.

**Count VIII. Negligent Design, Integration, and Manufacture Against Rolls-Royce**

66. Plaintiff incorporates the allegations in paragraphs 1 through 65 as if set forth here in their entirety.

67. Rolls-Royce designs and manufactures aircraft engines and integrates component parts (including the ECU) of its own choosing for Bell 407 helicopters, and more particularly for the Bell 407 involved in the Accident. Rolls-Royce has a duty of care to carry out such design, manufacture, and integration in a reasonably prudent and careful manner.

68. Because Plaintiff was a pilot engaged and authorized by the owner to fly the Bell 407 helicopter involved in the accident, Rolls-Royce owed that duty of care to design, manufacture, and integrate components into the engine in a reasonably prudent and careful manner to Plaintiff.

69. Rolls-Royce breached its duty of care to Plaintiff by negligently designing, manufacturing, and integrating parts (including the ECU) into the engine resulting in an uncommanded shutdown leading to the Accident.

70. Plaintiff was at all times in the exercise of due care.

71. Rolls-Royce's negligence in the design, manufacture, and integration of component parts (including the ECU) into the engine involved in the Accident was a proximate cause, individually or jointly and severally with the negligence of Bell Helicopter, Circor, Coltec, and Goodrich, of Plaintiff's injuries. Such injuries were foreseeable in the circumstance of an uncommanded shutdown.

72. Plaintiff has experienced, and continues to experience, significant physical and emotional injuries as a result of Rolls-Royce's negligent design and manufacture of the ECU involved in the Accident.

### Count IX.  Negligent Design and Manufacture Against Coltec

73. Plaintiff incorporates the allegations in paragraphs 1 through 72 as if set forth here in their entirety.

74. Coltec designs and manufactures FADECs and HMUs for aircrafts, including the Bell 407 model, and more particularly including the Bell 407 involved in the Accident. Coltec has a duty of care to carry out such design and manufacture in a reasonably prudent and careful manner.

75. Because Plaintiff was a pilot engaged and authorized by the owner to fly the Bell 407 helicopter involved in the accident, Coltec owed that duty of care to design and manufacture the FADEC and HMU in a reasonably prudent and careful manner to Plaintiff.

76. Coltec breached its duty of care to Plaintiff by negligently designing and manufacturing an FADEC and HMU that contributed to the uncommanded shutdown leading to the Accident.

77. Plaintiff was at all times in the exercise of due care.

78. Coltec's negligence in the design and manufacture of the FADEC and HMU involved in the Accident was a proximate cause, individually or jointly and severally with the negligence of Bell Helicopter, Circor, Goodrich, and Rolls-Royce, of Plaintiff's injuries. Such injuries were foreseeable in the circumstance of an uncommanded shutdown.

79. Plaintiff has experienced, and continues to experience, significant physical and emotional injuries as a result of Coltec's negligent design and manufacture of the FADEC and HMU involved in the Accident.

### Count X. Negligent Design and Manufacture Against Circor

80. Plaintiff incorporates the allegations in paragraphs 1 through 79 as if set forth here in their entirety.

81. Circor designs and manufactures fuel shut-off valves for aircrafts, including the Bell 407 model, and more particularly including the Bell 407 involved in the Accident. Circor has a duty of care to carry out such design and manufacture in a reasonably prudent and careful manner.

82. Because Plaintiff was a pilot engaged and authorized by the owner to fly the Bell 407 helicopter involved in the accident, Circor owed that duty of care to design and manufacture the fuel shut-off valve in a reasonably prudent and careful manner to Plaintiff.

83. Circor breached its duty of care to Plaintiff by negligently designing and manufacturing a fuel shut-off valve that malfunctioned, contributing to an uncommanded shutdown leading to the Accident.

84. Plaintiff was at all times in the exercise of due care.

85. Circor's negligence in the design and manufacture of the fuel shut-off vale involved in the Accident was a proximate cause, individually or jointly and severally with the negligence of Bell Helicopter, Coltec, Goodrich and Rolls-Royce, of Plaintiff's injuries. Such injuries were foreseeable in the circumstance of an uncommanded shutdown.

86. Plaintiff has experienced, and continues to experience, significant physical and emotional injuries as a result of Circor's negligent design and manufacture of the fuel shut-off valve involved in the Accident.

WHEREFORE, Plaintiff prays for relief as follows:

1. A finding of damages against Bell Helicopter for breach of its warranties relating to the Bell 407 helicopter involved in the Accident;

2. A finding against Circor for breach of its warranties relating to the Bell 407 helicopter involved in the Accident.

3. A finding against Coltec for breach of its warranties relating to the Bell 407 helicopter involved in the Accident.

4. A finding of damages against Goodrich for breach of its warranties relating to the Bell 407 helicopter involved in the Accident;

5. A finding of damages against Rolls-Royce for breach of its warranties relating to the Bell 407 helicopter involved in the Accident;

6. A finding of damages, including exemplary damages, against each of the defendants individually, and jointly and severally with the other defendants for negligent design, manufacture, and in the case of Rolls-Royce integration of component parts relating to the Bell 407 helicopter involved in the Accident;

7. For interest on such damage awards to the full extent permitted by law;

8. For reasonable attorneys' fees and costs to the full extent permitted by law; and

9. For such other and further relief as this Court deems appropriate.

**Plaintiff claims a trial by jury on all counts.**

                                      Plaintiff, Kurt West,

                                      By His Attorneys,

                                      /s/ Annmarie A. Tenn

                                      _____
                                      Joan A. Lukey, N.H. Bar. ID #16246 (application for admission to D. N.H. pending)
                                      Annmarie A. Tenn, N.H. Bar ID #16190
                                      Ropes & Gray LLP
                                      One International Place
                                      Boston, MA  02110-2624
                                      (617) 951-7000
                                      Joan.lukey@ropesgray.com

Date:  June 3, 2010