UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Kurt West

     v.                              Civil No. 10-cv-214-JL
                                       Opinion No. 2011 DNH 217

Bell Helicopter
Textron, Inc. *et al.*

**MEMORANDUM ORDER**

This is a products liability action arising out of a
helicopter crash in which the pilot, plaintiff Kurt West,
survived but suffered injuries.  West has sued the manufacturer
of the helicopter, defendant Bell Helicopter Textron, Inc., the
manufacturer of its engine, defendant Rolls Royce Corporation,
and the manufacturer of certain other components, including the
electronic control unit ("ECU") and hydromechanical unit ("HMU"),
defendant Goodrich Pump & Engine Control Systems, Inc.  This
court has jurisdiction over this action between West, a
Massachusetts citizen, and the defendants, corporations with
their states of incorporation and principal places of business
elsewhere, under 28 U.S.C. § 1332(a)(1) (diversity).

West alleges that the crash occurred when the helicopter
experienced an "uncommanded shutdown," in which the flow of fuel
to the engine was suddenly cut off without warning due to a
malfunction with the aircraft's ECU, part of its "Full Authority
Digital Engine Control" ("FADEC").  During this event, West says,

"the computer seized control of the engine" and caused a malfunction in the HMU, which interfaces with the FADEC to control the flow of fuel to the engine.  West asserts claims for breach of warranty, negligence, and strict products liability against each defendant.

West has served the defendants with requests for the production of documents, <u>see</u> Fed. R. Civ. P. 34, concerning, among other things, other accidents involving helicopters, engines, and components manufactured by the defendants.  The defendants have objected to a number of these requests on various grounds, including that these accidents involved products that were different from those involved in West's accident, or that they occurred for reasons different from those he alleges as the cause of his accident.

While the parties were able to resolve much of their disagreement through this court's informal procedure for handling discovery disputes, <u>see</u> Order of Nov. 19. 2010 (document no. 52), at 2-3--which, in this case, included a lengthy in-person conference in chambers--they remain at odds over certain requests.  Accordingly, this court ordered West to file a motion to compel the production of documents in response to those requests, <u>see</u> Fed. R. Civ. P. 37(a)(1), together with a supporting memorandum, and the defendants to file an objection.

2

After reviewing those submissions, this court grants West's motion to compel in part and denies it in part.

## Analysis

### A.   Relevance objections

The defendants object to a number of the document requests remaining in dispute on the ground that they are not "reasonably calculated to lead to the discovery of admissible evidence" and therefore outside the permissible scope of discovery.  Fed. R. Civ. P. 26(b)(1).  These requests (designated with their original numbers, and set forth to reflect the parties' agreed-upon modifications) ask the defendants to produce "[a]ll documents discussing or referring to" the following subjects:

> 10.  any reported (confirmed or unconfirmed) shutdown allegedly caused, in whole or in part, by (a) the model of the Subject ECU, (b) the model of the Subject HMU, and/or (c) the model of the Subject FADEC.

> 14.  (a) the fatal crash of Bell 407 Helicopter that prompted the National Transportation Safety Board ("NTSB") in or about 2003 to request that the Federal Aviation Administration ("FAA") address an allegedly "catastrophic failure mode" with the FADEC system in the Bell 407 and (b) [defendants'] efforts to correct the problem with the FADEC system.

> 19.  the Reversionary Governor ECU referenced in the Rolls-Royce January 29, 2007 Commercial Engine Bulletin entitled "Engine, Fuel and Control--Introduction of Reversionary Governor Electronic Control Unit ("the Reversionary Governor ECU") including (a) the reasons for the introduction of the Reversionary Governor ECU . . . .

In the document requests, the term "Subject" is used to denote the helicopter--a Bell 407--and component parts involved in West's crash, which is referred to as the "Accident."

The defendants argue that each of these requests includes documents about products different from those involved in West's crash, or accidents that occurred for reasons different from those he alleges as the cause of that crash, so that the documents are not "relevant to any party's claim or defense" under Rule 26(b)(1).  As the defendants point out, "the party seeking information in discovery over an adversary's objection has the burden of showing its relevance."  Caouette v. OfficeMax, Inc., 352 F. Supp. 2d 134, 136 (D.N.H. 2005) (citing cases).

This burden, however, should not be overstated.  As the court of appeals has instructed, "district courts are to interpret liberally the discovery provisions of the Federal Rules ov Civil Procedure to encourage the free flow of information among litigants."  Heidelberg Ams., Inc. v. Tokyo Kikai Seisakusho, Ltd., 333 F.3d 38, 41 (1st Cir. 2003).  This philosophy extends to the relevance standard of Rule 26(b)(1), which "[m]ost courts [to] have addressed the issue find . . . is extremely broad."  8 Charles Alan Wright et al., Federal Practice and Procedure § 2008, at 133 (3d ed. 2010).

This liberal approach extends to products liability cases like this one.  As one treatise notes, "[c]ourts routinely permit discovery of similar, if not identical models in products liability litigation, provided they share with the accident-causing model at least some characteristics pertinent to the legal issues in the litigation," as well as "[i]nformation regarding whether other purchasers or users experienced similar problems with the product."  3 Louis R. Frumer & Melvin I. Friedman, Products Liability § 17.01[1][c][I], at 17-6 (rev. ed. 2001 & 2011 supp.) (footnotes omitted).  In light of these standards--which the defendants have not questioned--their remaining relevance objections to the document requests fail.

**1.  Request no. 10**

First, the defendants argue that request no. 10 encompasses the ECU, HMU, and the FADEC in the Kiowa, a version of the Bell 407 used by the United States military, so that those components have "significant differences" from the versions of the components in the commercial 407 involved in West's accident. But the defendants simply list those differences without explaining how--or even directly asserting that--they might

affect a shutdown of the kind alleged by West.[1]  Nor do the
defendants claim that the Kiowa features different <u>models</u> of ECU,
HMU, or FADEC from those in its commercial counterpart (if they
did, the Kiowa would fall outside the scope of request no. 10,
which is limited by its terms to reported shutdowns allegedly
caused by the same model of each of those components that was
contained in West's helicopter).

Instead, the defendants protest that West has failed to
carry his burden to show the relevance of those reports because
the only support for his position that the commercial and
military versions of the 407 have the same components is his
proffer of "an undisclosed expert who would testify that the
components of the FADEC system are identical."  The defendants
maintain that West should have to submit an affidavit from the
expert to that effect--or even produce him for an evidentiary
hearing, at which the defendants will call their own expert to
elucidate "the differences between the two systems and why

_____

[1]According to the defendants, the Kiowa differs from the
commercial version of the Bell 407 in that the Kiowa has "a
certain Overspeed Trip Point in the ECU, a modification of the
Overspeed Hysterisis in the ECU, a Watchdog Timer PAL in the ECU,
a specific Manual Mode Engagement and Piston Slew Rate timing in
the HMU, and modified Piston orifice opening diameters in the
HMU" (formatting altered).  But the defendants do not state that,
let alone explain why, any of these features would make the Kiowa
subject to shutdowns in ways the commercial version would not so
as to affect the relevance of reports of shutdowns in the Kiowa
to the alleged shutdown of West's helicopter.

information about the Kiowa is unlikely to provide information
that is reasonably calculated to lead to the discovery of
admissible evidence."

Leaving aside the defendants' objection to West's recent
attempt to do exactly what they said he should have done, i.e.,
submit an affidavit from his expert,[2] the court simply cannot
accept this time- and resource-consuming approach to assessing
the relevance of information for purposes of discovery. Indeed,
the defendants' view seems to be not only that admissible
evidence is needed to support a discovery request (which is, of
course, one of the principal mechanisms a party uses to obtain
admissible evidence in the first place), but that the supporting
evidence must show the relevance of the request by a

_____

[2]About two weeks after filing the motion to compel and its
supporting documentation, West filed a motion for leave to
supplement that filing with an affidavit from the yet-
unidentified expert. The defendants, however, object to this
submission on the ground that allowing it after they have already
filed their objection to the motion to compel would deprive them
of their opportunity to respond. That problem could be easily
corrected by simply giving the defendants such an opportunity
(which they could use to submit an affidavit from their own
expert) but, by the same token, it could have been avoided
altogether had West simply submitted the affidavit with his
original moving papers (the only explanation he gives for not
doing so is that he would have "prefer[red] not to identify his
expert at this point in the proceedings"). But the court need
not decide who is more in the right (or less in the wrong) on
this point because, as is explained here, there is no basis for
demanding expert testimony to resolve relevancy objections to
discovery requests, at least in this case. West's motion for
leave to file the affidavit is denied as moot.

preponderance of the evidence.  They provide no authority for

this proposition, which (among other problems) is starkly at odds

with the prevailing approach to discovery under the Federal

Rules, particularly discovery of similar products and similar

accidents in products liability cases, as just discussed.[3]

In any event, in addition to proffering the testimony of his

expert, West has submitted an NTSB "Safety Recommendation"

listing the Kiowa among the "applications" of the FADEC found in

all Bell 407s, so he has something of evidentiary quality to

support his discovery request anyway.  The defendants' relevance

objection to request no. 10 is overruled.

---

[3]It is possible that such an approach could be warranted to
resolve relevancy objections to discovery requests that would
impose extraordinary burdens on the producing party.  But the
defendants have never claimed that the disputed requests impose
such a burden--or, for that matter, any burden beyond the expense
and inconvenience that typically attend litigation--even when the
court specifically, and repeatedly, asked them about that subject
at the discovery conference.

While the defendants have since stated, in their objection
to the motion to compel, that West's "discovery does not satisfy
the 'proportionality' principle" of Rule 26(b)(c)(iii), they
still do not articulate, or even claim, any particular burden in
responding.  Instead, they argue that the breadth of the requests
is unjustified in light of West's "relatively minor injuries."
In spite of the maxim that "any landing you can walk away from is
a good one," this court cannot say that the "relatively minor"
nature of West's injuries (a characterization he disputes anyway)
excuses the defendants from providing discovery that, again, is
routine in products liability cases.

2.   **Request no. 14**

Second, the defendants argue that the 2003 crash referenced
in request no. 14 is also irrelevant, because the NTSB, following
its investigation of that accident, found it had resulted from
the "mechanical failure of the potentiometer, a part mounted on
the HMU," rather than the "failure of the FADEC ECU software"
that West alleges was the cause of his accident.  Thus, the
defendants argue, the 2003 crash has "nothing to do with [West's]
theory of the case."

West, however, argues that the 2003 crash marked "the
beginning of unsuccessful efforts to correct the FADEC system and
its component parts, the HMU and the ECU."  West alleges that,
during the investigation of the 2003 crash, the NTSB identified
what it called a "'catastrophic failure mode' with the FADEC
system in the Bell 407s."  He states that later that year, Rolls-
Royce issued a "revision for the Bell 407 helicopter ECU," and
that the aircraft he was flying at the time of his accident "was
probably among the first Bell 407s in which Rolls-Royce employed
the new ECU."  But West claims that this revision "did not
correct, or at least did not fully correct, the 'catastrophic
failure mode.'"  Thus, he alleges, Rolls-Royce later (in 2007)
directed that the revised version be switched out for yet another
version of the ECU, known as the "Reversionary Governor ECU," so

as "to reduce incidences described as 'reversion to manual mode.'"  West alleges, though, that the owner of the 407 involved in his accident had not yet received the 2007 version of the ECU by that point, so that the helicopter he crashed in 2008 still had the 2003 version of the ECU.

These allegations show that the 2003 crash is potentially relevant to at least part of West's theory here, i.e., following that crash, Rolls-Royce revised the ECU, but did so in a way that failed to remove the defect that contributed to his accident.  At a minimum, documents concerning the crash, and Rolls-Royce's response, could lead to the discovery of admissible evidence that it was negligent in redesigning the ECU.  <u>See</u> 3 Frumer & Friedman, <u>supra</u>, § 17.01[1][c][I], at 17-6 ("Prior accidents involving different but similar products are relevant in products liability litigation to show notice to the defendant").  This theory of relevance is not negated by the NTSB's eventual conclusion--in 2006, some three years after the crash had occurred and the ECU had been redesigned--that it resulted from a mechanical failure of the ECU, rather than the software malfunction that West alleges to have caused his accident.  The defendants' relevance objection to request no. 14 is overruled.

### 3.    Request no. 19

For similar reasons, the court also overrules the defendants' relevance objection to request no. 19, which seeks documents concerning the "Reversionary Governor ECU."  As just discussed, that was the version of the ECU introduced in 2007 to reduce reversions to manual mode.  The defendants emphasize that this version of the ECU had not been installed in the helicopter piloted by West prior to his accident, and that he does not claim that a reversion to manual mode played any role in it.  Again, though, evidence that Rolls-Royce modified the ECU to fix one defect, but did so without acting on the defect alleged by West, is relevant:  it could show, for example, that the defendants knew or should have known of the alleged defect but failed to warn of it.  The defendants' relevance objection to request no. 19 is overruled.[4]

---

[4]While the defendants state in their objection to the motion to compel that request no. 19 encompasses "an extraordinary volume of documents," they do not explain any further.  It is unclear, then, whether the defendants are making an objection to this request under Rule 26(b)(2)(C)(iii).  If they are, though, that objection is insufficiently developed to warrant discussion. See also note 2, supra.

**4.   Request nos. 9, 12, and 22**

Goodrich, but not the other defendants, also objects to three of West's other document requests on relevance grounds.[5] Two of these requests (designated with their original numbers, and set forth to reflect the parties' agreed-upon modifications) ask Goodrich to produce:

> 9.   All documents discussing or referring to, embodying, or resulting from any complaint, whether judicial, administrative or in the form of a demand letter threatening litigation, regarding (a) a suspected uncommanded shutdown; (b) a fault, deficiency, or failure of the ECU; (c) a fault, deficiency, or failure of the FADEC; or (d) a fault, deficiency, or failure of the HMU, of a Bell 407 or another Bell helicopter model that employs the same ECU, HMU, and FADEC as the Subject ECU, Subject HMU, and Subject FADEC.

> 22.   Copies of the complaint and any final disposition or resolution on every court action filed against [Goodrich] or its parent company since January 1, 2000 relating to a helicopter accident involving either (a) an alleged uncommanded shutdown, or (b) an accident caused by a failure or non-mechanical fault in the same

---

[5]West claims that he and Goodrich had actually resolved their disputes over these requests during a conference between counsel, but Goodrich disagrees.  Goodrich states that, after the conference, counsel for West asked whether Goodrich wanted "to modify or expand the list" (apparently a list of outstanding discovery disputes) that West's counsel had prepared, and that Goodrich "chose on further review to modify and expand the list" to include these other objections.  This seems contrary to the spirit of Rule 37(a)(1), requiring parties to make good faith efforts to resolve discovery disputes, but the court need not decide whether those efforts here created an enforceable agreement because the objections Goodrich resurrected "on further review" are without merit.

model of ECU, HMU, and FADEC as the Subject ECU,
Subject HMU, or Subject FADEC.

Goodrich argues that, while it has agreed to produce documents
responsive to request nos. 9 and 22 insofar as the shutdown in
question "occurred due to a fault, deficiency or failure of the
part number ECU and HMU involved in this case," it objects to
producing responsive documents about shutdowns "not caused by a
fault, defect or deficiency of the ECU or HMU," or caused by
components with "different part numbers."

As West points out, request no. 9 does not encompass <u>all</u>
documents regarding uncommanded shutdowns or faults,
deficiencies, or failures of the specified components, but only
documents "discussing or referring to, embodying, or resulting
from any complaint" regarding one of those subject events.  In
addition, at least as the court reads the request, it is further
limited to those subject events in "a Bell 407 or another Bell
helicopter model that employs the same ECU, HMU, and FADEC as the
Subject ECU, Subject HMU, and Subject FADEC."  Request no. 9,
then, is limited to documents "referring to, embodying or
resulting from" complaints of either (1) uncommanded shutdowns of
Bell helicopters equipped with the same relevant component parts
as West's helicopter, or (2) faults, deficiencies, or failures of
those components.  Part (b) of request no. 22 is similarly

13

limited to complaints of a "failure or other non-mechanical fault" in those same components.

As already discussed, information about third parties' similar problems with the product at issue is relevant to product liability claims because it may show, among other things, that the manufacturer knew or should have known of defects in the product but failed to correct or to warn of them. 3 Frumer & Friedman, supra § 17.01[1][c][I], at 17-6. As also already discussed, this theory of relevance is not negated by the fact that those problems are different from the particular ones alleged by the plaintiff.

The only part of request nos. 9 and 22 that sweeps beyond the same model of ECU, HMU, and FADEC that were involved in West's crash is part (a) of request no. 22. Yet, while it is broader than those other requests in that sense, it is narrower in the sense that it does not seek documents "referring to, embodying or resulting from" complaints of uncommanded shutdowns, but only the complaints themselves, and only in court actions against Goodrich relating to helicopter accidents and filed since January 1, 2000 (and the disposition of those actions). Given the limited scope of this request, and the seemingly insignificant burden on Goodrich in responding to it, this court rules that part (b) of request no. 22 is reasonably calculated to

lead to the discovery of admissible evidence, even though it extends to lawsuits over products that are not identical to those involved in West's accident.  Again, the universe of relevant information in a products liability is not limited to the product at issue, but extends to similar ones, 3 Frumer & Friedman, <u>supra</u> § 17.01[1][c][I], at 17-6, and request 22(b) is sufficiently targeted at that subject to be permissible.

Goodrich also objects to request no. 12, which asks for "[a]ll documents from January 1, 2002 to January 1, 2009 comprising or discussing or referring to bulletins, advisories, information letters, or safety warnings regarding the Bell 407, or the ECU, HMU (non-mechanical), or FADEC comprising component parts in the Bell 407."  Goodrich explains that, though it has agreed to produce such documents "which apply or relate to 'safety issues or concerns,'" the request extends to "unlimited correspondence that may casually mention the bulletins etc. even in a non-substantive way."  It is not easy to see how documents that a manufacturer creates as to advisories and other precatory communications about its products would "casually mention" those warnings in a "non-substantive way," and Goodrich does not elaborate.  In any event, documents containing only "casual" references to the safety bulletins and the like would seem to constitute only a small percentage of the documents otherwise

responsive to this request--the relevance of which Goodrich does
not further question.  Request no. 12 is reasonably calculated to
lead to the discovery of admissible evidence.  Goodrich's
objections to request nos. 9, 12, and 22 are overruled.[6]

## B.   Privilege and other protections from discovery

The defendants also object to requests nos. 10 and 14 on the
ground that they both call for documents protected from discovery
in some way.  Specifically, the defendants argue that (1) request
no. 10 encompasses documents prohibited from disclosure under
NTSB regulations and, insofar it seeks information about Kiowa
helicopters, Department of Defense regulations, and (2) request
no. 14 calls for documents protected by the so-called "self-
critical analysis" privilege.  West argues that these objections
have been waived and that, in any event, they do not apply.  This
court agrees that the defendants have waived any "self-critical
analysis" privilege, and any protection afforded by the NTSB
regulations, but disagrees that they have waived the application
of the DoD regulations.  Nevertheless, the defendants have failed

---

[6]While Goodrich raised an objection to request nos. 15 and
17 in its informal written submission to the court, arguing that
it did "not perceive a difference between" them, it does not
reiterate that or any objection to requests no. 15 and 17 in its
objection to the motion to compel and, as West points out,
"overlap between [r]equests is not a basis for withholding
responsive documents."

to describe the nature of the documents responsive to request no. 10, if any, that are protected from disclosure by the fairly complex scheme of DoD regulations they have invoked, so this court cannot yet resolve that objection.

### 1.   Waiver

As the court of appeals has observed, Rule 34(b) "requires that a party on whom a request for discovery is served respond within thirty days, either stating its willingness to comply or registering its objections.  If a party fails to make a timely objection, or fails to state the reason for an objection, he may be held to have waived" it.  <u>Marx v. Kelly, Hart & Hallman, P.C.</u>, 929 F.2d 8, 12 (1st Cir. 1991).  Moreover, this "assertion of privilege . . . must also be accompanied by sufficient information to allow the court to rule intelligently on the privilege claim."  <u>Id.</u>

Here, none of the defendants raised the "self-critical analysis" privilege in their formal responses to West's document requests, either in their "general objections" to the requests as a whole, or in their specific objections to request nos. 10 and 14.[7]  Under the <u>Marx</u> decision, that is itself enough to hold that

---

[7]Bell's "general objections" alluded to "any other applicable privilege or immunity provided under New Hampshire or other applicable law" while Goodrich's invoked "any other

any such objections have been waived.  929 F.2d at 12.  But, as

suggested by the Marx court's language (a party "may be held to

have waived" an objection omitted from its timely discovery

responses), that conclusion is not mandatory.  As the defendants

point out, some courts have shied away from treating waiver as

"an automatic consequence of every failure to comply with Rule

34(b)'s time limit for responding to a discovery request with

sufficient detail."  8 Wright, supra, § 2016.1, at 331.  Instead,

they have "'reserved the sanction for those cases where the

offending party committed unjustified delay in responding to

discovery.'"  Id. at 330 (quoting Ritacca v. Abbott Labs., 203

F.R.D. 332, 225 (N.D. Ill. 2001)); see also, e.g., Rivera v.

Kmart Corp., 190 F.R.D. 298, 300 (D.P.R. 2000).

Applying this standard, the court concludes that the

defendants have waived their objections to request nos. 10 and 14

under the "self-critical analysis" privilege and the NTSB

regulations, but not the DoD regulations.  The defendants suggest

that the "self-critical analysis" privilege shields their

investigation and response to the 2003 crash on the theory that

allowing them "to candidly assess the source of aviation

---

applicable protection or immunity from discovery," but those
assertions were plainly not "accompanied by sufficient
information," Marx, 929 F.2d at 12, to amount to a proper
assertion of any of the protections now at issue.

accidents promotes sufficiently important interests to outweigh"
the need for any resulting information as evidence in subsequent
litigation.  Assuming, without deciding, that such a privilege
exists, its applicability to at least some of the documents
responsive to request no. 14--which, again, asks for "[a]ll
documents discussing or referring to" the 2003 crash, as well as
the defendants' "efforts to correct the problem with the FADEC
system" that allegedly caused it--should have been readily
apparent from the face of that request itself.

Yet, so far as the record reflects, the defendants did not
even mention the "self-critical analysis" privilege until a
letter to the court on October 3, 2011.  This was more than four
months after their formal responses to the requests, and more
than a month after the discovery conference with the court--at
which the defendants' relevance objections to the same requests
were extensively discussed, but the "self-critical analysis"
privilege was never raised (either at the conference itself or in
the defendants' written submissions beforehand).  The defendants
have not explained why they did not raise the privilege earlier.
In the court's view, their "unjustified delay" in raising the
"self-critical" analysis privilege amounts to a waiver of it
(assuming, again, that it even exists under New Hampshire law, a

point on which this court expresses no view).[8]  See Moloney v. United States, 204 F.R.D. 16, 21 (D. Mass. 2001) (ruling that defendant had waived self-critical analysis privilege by omitting it from other objections raised in its initial response to the discovery requests and not raising the privilege until its objection to the motion to compel).

The same is true of the NTSB regulations, which the defendants say "prohibit parties from disclosing information concerning [an] accident or incident before initial release by the [NTSB]," and, as a result, bar them from producing "information regarding ongoing NTSB investigations" in response to request no. 10.  While in their formal responses to document request no. 6 (which is no longer in dispute), Bell stated that it was "precluded from providing investigative documents to any entity not a party to the NTSB investigation while the NTSB investigation is ongoing," and Rolls-Royce stated, less specifically, that the requests sought "information about ongoing investigations that [it] cannot lawfully provide," they did not raise this objection to request no. 10 or, for that matter, any

_____

[8]While the defendants argue for recognition of the privilege under federal law, state law controls the issues of privilege in this diversity case.  See Fed. R. Evid. 501; Fashion House, Inc. v. KMart Corp., 892 F.2d 1076, 1098 n.11 (1st Cir. 1989).

other document request.  Goodrich did not raise such an objection in their formal discovery responses at all.

Moreover, after the defendants failed to even mention the NTSB regulations in their written submission to the court in advance of the discovery conference, the court there expressed the view that the defendants had waived the protection (if any) of those regulations, pointing out that they had yet even to cite them to the court.  Cf. Marx, 929 F.2d at 12 (affirming ruling that an objection to document requests had been waived when its assertion was both "untimely," coming more than 30 days after the requests, and "totally uninformative").  Yet, at the conference, the defendants did not attempt to explain that deficiency or offer to correct it.

Instead, as in the case of the defendants' objection to request no. 14 under the "self-critical analysis" privilege, they did not raise their objection to request no. 10 under the NTSB regulations to the court until their letter of October 3.  The defendants have not endeavored to explain that delay (they do not suggest, for example, that they did not initially realize the request encompassed information about ongoing NTSB investigations).[9]  So, just as in the case of the "self-critical

---

[9]The defendants note that the NTSB regulations' asserted prohibition on disclosure of information about accidents under investigation was "raised in their answers to [West's] complaint

21

analysis" privilege, the court finds that this delay was unjustified and amounts to a waiver of whatever protection the NTSB regulations might have conferred against request no. 10.

The defendants have, however, offered a justification for the fact that their objection to request no. 10 under the DoD regulations was late (at least under the 30-day deadline imposed by Rule 34(b)).  Pointing out that the request does not specifically mention the military version of the Bell 407, the defendants argue they had "no reason to raise an objection based on the [DoD] regulations" until "it became clear that [West] was seeking information about aircraft that had been built in accordance with military specifications," at which point they "immediately objected."  The court has no reason to doubt this explanation, at least based on the materials that have been submitted over the course of this discovery dispute.

To the contrary, it makes perfect sense that the defendants' understanding of the scope of West's discovery requests would have evolved over the course of their counsel's efforts to

_____

and discussed at the preliminary pretrial conference."  But such "a blanket assertion of privilege"--to say nothing of an anticipatory one--"is generally insufficient."  In re Grand Jury Subpoena (Mr. S.), ___ F.3d ___, 2011 WL 5153837, at *4 (1st Cir. Nov. 1, 2011).  If anything, the fact that the defendants were aware of the potential application of the NTSB regulations to West's discovery requests before he even made them makes it harder to understand their failure to raise the regulations as an objection to his requests after he did make them.

negotiate that subject with counsel for West.  Accordingly, the
court finds that the defendants' assertion of the DoD regulations
in response to request no. 10, while untimely under Rule 34(b),
was not an "unjustified delay" so as to amount to a waiver of
that objection.  <u>See</u> <u>Rivera</u>, 190 F.R.D. at 301 (finding privilege
objection had not been waived, though omitted from party's
initial response, when the documents' "relevance and
responsiveness may not have been known" at that time).

### 2.  DoD regulations

The DoD regulations invoked by the defendants require any
contractor "obtaining export-controlled technical data" from the
DoD to certify, among other things, that--with an exception
discussed <u>infra</u>--"it will not provide access to export-controlled
technical data subject to this Part to persons other than its
employees or persons acting on its behalf."  32 C.F.R.
§ 250.3(a)(4).  This restriction applies to

> [a]ll unclassified technical data with military or
> space application in the possession of, or under the
> control of, a DoD Component which may not be exported
> lawfully without an approval, authorization, or license
> under . . . the Arms Export Control Act.  However, the
> application of this Part is restricted only to such
> technical data that disclose critical technology with
> military or space application.

<u>Id.</u> § 250.3(a)(1).  The Arms Export Control Act, in relevant
part, authorizes the creation of the "United States Munitions
List," a designation of "those items which shall be considered as

defense articles and defense services" subject to restrictions on their import and export.  22 U.S.C. § 2778(a).

This list includes "helicopters . . . which are specially designed, modified, or equipped for military purposes," as well as their "specifically designed or modified" engines and certain "specifically designed" components, including digital engine controls such as the FADEC.  22 C.F.R. § 121.1, cats. VIII(a), (b).  Moreover, the list designates these items as "Significant Military Equipment," or "SME," and "technical data directly related to the manufacture or production of any defense articles . . . designated as [SME] shall itself be designated SME."  Id. § 121.1(a).  The term "technical data," in turn, is defined as information "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles," including "blueprints, drawings, photographs, plans, instructions or documentation." Id. § 121.10(a)(1).

Thus, the defendants argue, request no. 10 (which, again, calls for all documents discussing or referring to reported shutdowns allegedly caused by the same model ECU, HMU, or FADEC that was in West's helicopter) encompasses "technical data directly related to the manufacture or production" of those components in the Kiowa--data to which the defendants cannot allow access under 32 C.F.R. § 250.3(a)(4).  Based on this

24

assertion, which is all the defendants have provided at this point, § 250.3(a)(4) may well prevent them from producing some of the documents responsive to request no. 10.

It seems unlikely, however, that every document within the scope of that request, insofar as includes reports of the specified shutdowns in the Kiowa, falls within the scope of § 250.3(a)(4).  As just discussed, that regulation prevents the disclosure of only that technical data which <u>both</u> "disclose[s] critical technology with military or space application" <u>and</u> appears on the Munitions List, 32 C.F.R. § 250.3(a)(1), and the relevant provisions of the List cover only that data which is itself <u>both</u> "directly related to the manufacture and production" of certain "specifically designed" components of the Kiowa, 22 C.F.R. § 121.1(a), and "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification" of those articles, <u>id.</u> § 121.10(a)(1).  Furthermore, as West emphasizes, § 250.3(a)(4) contains an exception on its ban on the disclosure of such technical data, allowing its dissemination to "as may be required by court order."  32 C.F.R. § 250.5(h)(4).

To enable the proper application of § 250.3(a)(4) to request no. 10, then, the defendants shall provide West with a privilege log identifying each document as to which they claim the regulation applies and describing the document "in manner that,

25

without revealing information itself privileged or protected,
will enable other parties to assess the claim." Fed. R. Civ. P.
26(c)(5)(A)(ii). This description shall include a brief
explanation as to how each document (1) discloses critical
technology with military or space application, (2) directly
relates to manufacture of specifically designed components of the
Kiowa, and (3) is required for the design, development,
production, manufacture, assembly, operation, repair, testing,
maintenance or modification of those components, all of which are
necessary to bring a document within the scope of § 250.3(a)(4).
If West disagrees with any of these designations, he shall
attempt to resolve that disagreement by conferencing with the
defendants, <u>see</u> Fed. R. Civ. P. 37(a)(1), and, if that effort
fails to produce agreement, may seek relief with the court
according to its preliminary pretrial order, <u>see</u> document no. 52.

**C.   Documents the defendants claim do not exist**

Finally, West moves to compel the defendants to respond to
request no. 21, which seeks "all documents discussing or
referring to (a) the fact that post-Accident downloads from the
Subject ECU did not record faults related to the uncommanded
shutdown, and (b) the reasons that the Subject ECU did not record
faults that could explain the engine flameout or the uncommanded
shutdown." The defendants state that they have already produced

26

"the non-privileged documents that exist discussing the FADEC download from the accident aircraft."

West does not seem to disagree with this statement. Instead, he asserts that "the failure of to detect and record faults is a known defect in the ECU of the Bell 407."  But even if this is true, it does not follow that the defendants would have documents discussing whether this defect manifested itself in West's helicopter and, again, the defendants have stated that, if any such documents exist, they have been produced.  Of course, West is free to test this assertion through the depositions of the defendants' witnesses or other discovery devices, but, so long as it holds up, this court "cannot compel a party to produce documents that do not exist."  Payless Shoesource Worldwide, Inc. v. Target Corp., No. 05-4023, 2008 WL 973118, at *4 (D. Kan. Apr. 8, 2008) (quotation marks omitted).


## Conclusion

For the foregoing reasons, West's motion to compel[10] the defendants to produce documents is GRANTED over their objections as to request nos. 14 and 19, GRANTED over Goodrich's objections as to request nos. 9, 12, 15, 17 and 22, and GRANTED in part over the defendants' assertion of DoD prohibitions on disclosure as an objection to request no. 10, in that the defendants must provide

---

[10]document no. 71.

West with the privilege log described in Part B.2, <u>supra</u>.  The
defendants shall provide West with all of the information
required by this order with 45 days.  West's motion to compel is
DENIED as to request no. 21.  West's motion for leave to file a
supplemental affidavit[11] is DENIED as moot.

      **SO ORDERED.**

                                        /s/ Joseph N. Laplante
                                        Joseph N. Laplante
                                        United States District Judge

December 20, 2011

cc:  Phillip S. Bixby, Esquire
     L. Robert Bourgeois, Esquire
     Martha C. Gaythwaite, Esquire
     Sara Gutierrez Dunn, Esquire
     Joan A. Lukey, Esquire
     John P. O'Flanagan, Esquire
     Brian M. Quirk, Esquire
     Rachel A. Ruberson, Esquire
     Annmarie A. Tenn, Esquire
     Jason L. Vincent, Esquire
     James C. Wheat, Esquire

---

[11]document no. 75.