UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Kurt West

     v.                                   Civil No. 10-cv-214-JL
                                           Opinion No. 2014 DNH 208

Bell Helicopter
Textron, Inc. _et al._

**MEMORANDUM ORDER**

This products liability action presents a staggering disconnect between the severity of the plaintiff's claimed injuries--for which he claimed only $7,000 in recoverable medical expenses and no other monetary damages--and the resources expended in his pursuit of compensation for those injuries.[1] Among other things, the plaintiff, Kurt West, brought claims against four different defendants (one of whom was dismissed from the case in the early stages for lack of personal jurisdiction, see Fed. R. Civ. P. 12(b)(2)); subjected the remaining defendants to requests for the production of documents, see Fed. R. Civ. P. 34, which, they say, cost more than $800,000 to answer in total; took numerous depositions; filed a dozen pre-trial motions in limine, including challenges to the defendants' designated expert witnesses; and, ultimately, proceeded to trial before a jury, which took three weeks.

At the end of the trial, the jury found in favor of the defendants on West's claims, which arose out of an accident that

---

[1]For a description of the plaintiff's claimed damages, see infra at 3-4.

occurred in a helicopter he was piloting on behalf of his employer in December 2008.  West's claims alleged that the helicopter had crashed due to its defective design by the defendants:  Bell Helicopter Textron, Inc., which manufactured the helicopter, a Bell 407 model; Rolls Royce Corporation, which manufactured the engine; and Goodrich Pump & Engine Control Systems, Inc. ("Goodrich" or "GPECS"), the corporate successor to the entity that manufactured the helicopter's electronic control unit ("ECU"), part of the engine's full authority digital engine control ("FADEC").  Because West is a citizen of a different state than any of these corporations, this court has jurisdiction under 28 U.S.C. § 1332(a)(1) (diversity).

At trial, West argued that the ECU falsely registered a short circuit in one of its electronic components as an "overspeed" event (i.e., the rotor was spinning too fast), triggering the closure of a fuel shutoff valve, or solenoid--a phenomenon known as "false overspeed solenoid activation," or "FOSSA."  This in turn, caused the engine to "flame out" (i.e., lose power), forcing West, a professional pilot, to land the helicopter through a technique known as "autorotation"--which he did, on a residential street in Bow, New Hampshire, resulting in physical and psychological injuries to himself.

The defendants, for their part, agreed that the engine in West's helicopter had flamed out and necessitated what they

2

termed his "hard landing," but argued that the flame-out was not the result of any defect in the ECU.  Instead, they maintained, the engine flamed out because it ingested ice or snow that West and a co-worker had failed to properly clean from the helicopter before West's flight.

The defendants also disputed the nature and extent of West's claimed injuries.  West was diagnosed with post-traumatic stress disorder, and testified that this has manifested itself in (among other symptoms) reliving the accident through a vivid and disturbing dream he had experienced nearly every night since. But the defendants emphasized that West had resumed working as a commercial helicopter pilot shortly after the accident--which required him to, among other things, practice the same autorotation procedure he had used in the accident at a training course just three weeks later--and had not sought medical attention for his alleged nightmares and other psychological problems until September 2010, some 20 months after he said the daily nightmares had begun, and nearly 3 months after he had filed this lawsuit.  West also continued flying, as a professional pilot, the very same model of helicopter that was involved in his accident and that, accordingly, was the subject of his daily nightmare, and photographs were introduced at trial (having been posted on his Facebook account) of West apparently enjoying himself while flying.  Ultimately, West claimed just

3

$7,000 or so in recoverable medical expenses, and nothing in lost wages or other special damages, due to the accident.

Over the fifteen days of trial, the jury heard testimony from several designated expert witnesses, as well as other evidence, supporting the parties' conflicting theories as to the cause of West's accident.  After nearly two full days of deliberations, the jury returned with a verdict for the defendants, as noted at the outset, finding that West had failed to prove his claims of negligence and strict liability by a preponderance of the evidence.  This court then entered judgment for the defendants on the jury's verdict, together with the entry of judgment for the defendants as a matter of law, see Fed. R. Civ. P. 50(a)(1), on West's claims for breach of the implied warranty of fitness for a particular purpose and West's negligence claim against Bell, as well as any theory that the defendants had failed to warn him of the risks of a FOSSA event.

Nevertheless, West's dogged pursuit of compensation for his injuries continues.  He now seeks a new trial, see Fed. R. Civ. P. 59, as well as relief from the judgment against him, see Fed. R. Civ. P. 60(b).  West does not claim that the verdict was against the weight of the evidence.  But these motions raise a number of other issues, and their breadth (together with the length of the trial and the complexity of the subject-matter) has

4

necessitated the overall lengthy discussion here.  Yet there is less to West's motions than meets the eye.  Specifically:

• West claims that this court erred by redacting, from memoranda from Goodrich to Rolls Royce that were admitted into evidence, statistics as to the anticipated rate at which FOSSA would occur, even though it deviated from the rate specified by Rolls Royce.  But West provided no evidence that this deviation had anything to do with his accident, so the statistics were irrelevant and, in any event, were testified to by one of West's expert witnesses, see infra Part II.A.1;

• West claims that Rolls Royce improperly cross-examined his employer about the provisions in his company's operations manual for cleaning ice and snow from a helicopter.  But the manual was not admitted into evidence and the witnesses answered only one question about it--to which West did not object, see infra Part II.A.2;

• West claims that this court improperly excluded opinion testimony from two of his witnesses that the absence of fuel spatter on West's helicopter after the accident meant that it could not have resulted from ice or snow.  But West did not adequately proffer that testimony at or before trial and it would have been properly excluded as undisclosed expert testimony in any event, see infra Part II.A.3;

• West claims that counsel for Rolls Royce made three statements in her closing argument that were unsupported by the evidence.  But the court instructed the jury to disregard any such comments, and West cannot show any prejudice from the fact that these instructions were given as part of the final charge rather than just after Rolls Royce's closing argument, see infra Part II.B;

• West claims that Goodrich failed to disclose information about a crash of another Bell 407 in August 2013, just before trial started.  But West has not shown that Goodrich culpably withheld what little information it had about that accident before the end of trial, or that having that information earlier would have helped his case, since he has provided no evidence that the accident was a FOSSA event or otherwise relevant, see infra Part II.C.1;

• West claims that Bell and Rolls Royce failed to disclose, prior to the end of trial, what they announced in product

alerts they issued in late January 2014, months after the end of trial, i.e., that the model of Bell 407 involved in his accident was susceptible to FOSSA from the failure of components in the ECU circuit boards.  But West knew, from documents he received in discovery, that the defendants were indeed aware of this problem, and, in fact, that the defendants were negligent in correcting the problem was his theory of liability at trial, see infra Part II.C.2;

• West claims that this court improperly declined to instruct the jury on his failure-to-warn theory.  But, because West was warned and admittedly knew of the danger he encountered, i.e., that the engine could flameout in mid-air necessitating an autorotational landing, he could not show any causal connection between the alleged failure to warn and his accident, see infra Part II.D.1;

• West claims that this court improperly declined to instruct the jury on the res ipsa loquitur doctrine.  But he could not show, as that doctrine requires, that the instrumentality causing his injury was in the defendants' exclusive control, since the helicopter was in fact in the control of him and others at his employer prior to the accident, see infra Part II.D.2;

• West claims that this court improperly received ex parte memoranda from the parties at the start of trial in support of their anticipated motions for judgment as a matter of law, see Fed. R. Civ. P. 50(a).  But West agreed, and availed himself of, this procedure, which was discussed and ordered prior to trial and, in any event, West was given, and availed himself of, the opportunity to respond to all of the defendants' Rule 50 arguments before the case went to the jury, see infra Part II.E; and

• insofar as West claims that this court hindered his attempt to prove his case by its "declination" to rule on the parties' discovery or scheduling disputes, that claim is misplaced.  It was West's counsel who decided to resolve those disputes by negotiated agreement and, in any event, West cannot show that, had he instead stuck to his guns and awaited relief from the court, that he would have obtained it or that the resulting information would have been helpful to his case, see infra Part II.F.

As set forth fully below, then, West's motions for a new trial and for relief from the judgment against him are denied.

I.   **Applicable legal standards**

   A.   **Rule 59**

Under Rule 59, this court "may set aside a jury's verdict and order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice." Sanchez v. P.R. Oil Co., 37 F.3d 712, 717 (1st Cir. 1994).  Again, West does not argue that the verdict was against the weight of the evidence, so, insofar as he bases his motions on claimed errors by the court, he must show not only that they were in fact errors, but that they affected his substantial rights.[2] See Fed. R. Civ. P. 61.  "The burden of proving substantial prejudice lies with the party asserting error." Cabral v. Dep't of Justice, 587 F.3d 13, 22 (1st Cir. 2009).

West faces an even higher hurdle as to alleged errors he identifies now but did not raise at trial.  "A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during trial unless the error was so fundamental that a gross injustice would result."  11 Charles Alan Wright et al., Federal Practice & Procedure § 2805, at 73 (3d ed. 2012).

---

[2]A different analysis governs West's claims that this court erred in refusing to instruct the jury on his failure to warn and res ipsa loquitur theories, since those rulings were based on a lack of evidence.  See infra Part II.D.

7

**B.    Rule 60**

West's motions also seek relief for the defendants' alleged withholding of information under both Rule 60(b)(2) and Rule 60(b)(3).  Rule 60(b)(2) authorizes relief from judgment on the basis of "newly discovered evidence," requiring "proof of the following elements:  (1) the evidence has been discovered since the trial; (2) the evidence could not by due diligence have been discovered earlier by the movant; (3) the evidence is not merely cumulative or impeaching; and (4) the evidence is of such a nature that it would probably change the result if a new trial is granted."  Mitchell v. United States,  141 F.3d 8, 18 (1st Cir. 1998) (quotation marks omitted; formatting altered).  "The moving party bears the burden of meeting each of the four Mitchell criteria."  U.S. Steel v. M. DeMatteo Constr. Co., 315 F.3d 43, 52 (1st Cir. 2002).

Rule 60(b)(3), meanwhile, authorizes a court to grant a party relief from an adverse judgment on the basis of "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party."  As West points out, the "[f]ailure to disclose or produce materials requested in discovery can constitute 'misconduct'" under this rule, even without "proof of nefarious intent or purpose."  Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988).

8

Nevertheless, to obtain relief under Rule 60(b)(3), the moving party must both (A) "prove the adverse party's culpable misconduct by clear and convincing evidence" and (B) "show by a preponderance of the evidence that the culpable misconduct substantially interfered with her ability fully and fairly to prepare for, and to proceed to judgment." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013) (quotation marks and bracketing omitted).

## II.  **Analysis**[3]

### A.  **Evidentiary rulings**

West seeks a new trial based on three of the court's evidentiary rulings during the fifteen days of trial.  As fully explained below, however, those rulings were either correct or not the subject of any contemporaneous objection by West (who has failed to show that those previously unchallenged rulings worked a "gross injustice").  Moreover, the evidence admitted or excluded as a result of the rulings West challenges here "cannot reasonably be understood as the pivotal evidence that tipped the verdict in favor of" the defendants, making these evidentiary decisions no basis for a new trial in any event.  Gay v. Stonebridge Life Ins. Co., 660 F.3d 58, 64 (1st Cir. 2011).

---

[3]Given the breadth of the issues raised by West's motions, this court has foregone a dedicated survey of the background facts in favor of an argument-by-argument review.

9

1.   **Exclusion of reliability data**

West argues that this court erred in excluding "evidence about [Goodrich's] ECU reliability data" as set forth in "documents" that West tried to introduce while cross-examining their author, Bruce Millar, a Goodrich employee who testified at trial.  Mem. Supp. Mot. New Trial at __ .  While West's motion does not identify these "documents," by exhibit number or otherwise, it refers to a portion of the trial transcript where the court sustained the defendants' objection to West's proffered exhibits 372, 398, and 552.  Tr. Trans. Sept. 23 a.m. at 61-62. So the court has assumed that these are the "documents" on which West is basing his argument.  These documents are memoranda from Millar (and others at Goodrich) to Rolls Royce, dated January 2007, December 2007, and October 2008, about the model of ECU that was installed in West's helicopter at the time of his accident.  Pl's Exs. 372, 398, 552.

West argues that the "reliability statistics" in these memoranda "demonstrated that [Goodrich] and Rolls Royce deviated from Rolls Royce's own reliability standards."  Mem. Supp. Mot. New Trial at 5-6.  But West (who, as just noted, does not even identify the documents he claims should have been admitted) does not specify the "statistics" he has in mind, and the court's review of exhibits 372, 398, and 552 reveals that just one,

exhibit 552, contains "Rolls Royce's own reliability standards."

That memorandum, from December 2007, says in relevant part:

> if the current design configuration is changed to
> replace the 22 uF [tantalum] capacitor, using the
> actual failure rates of the [military] grade 0.1 uF.
> SMT capacitors, the failure mode effect analysis (FMEA)
> calculated probability of a false [overspeed] solenoid
> activation estimate is 1.55e-7 and does not quite reach
> the recommended safety specification of 1.0e-7.

Pl's Ex. 552, at 2 (capitalization omitted).[4]  This and other

passages from the memorandum were redacted from the version that

was admitted at trial, as exhibit 552b.

West argues that these "statistics" should have been

admitted on the theory that a manufacturer's own standards "'may

be admissible as evidence of negligence or defectiveness of the

product, if it is shown that the manufacturer failed to meet such

standards.'"  Mem. Supp. Mot. New Trial at 5 (quoting 3 David G.

Owen et al., Madden & Owen on Products Liability § 27:6, at 827

(3d ed. 2008)).  The problem with this argument, as the court

ruled at trial, Tr. Trans. Sept. 23 a.m. at 61-62, was that there

was no evidence linking the failure of the ECU to meet Rolls

Royce's reliability standard, as articulated in the December 2007

memorandum (i.e., no more than one occurrence of FOSSA per 10

million flight hours), to West's accident.

---

[4] Based on other evidence received at trial, the expression
"1.55e-7" translates to 1.55 events per 10 million hours of
flying (so that the expression "1.0e-7" translates to 1 event per
10 million hours of flying).

Before revisiting this ruling, it is important to note that
West does not argue that the "reliability statistics" had any
probative value on the issue of whether FOSSA caused his
accident.[5]  To the contrary, West's new trial motion asserts that
the "reliability statistics" are relevant to what he sees as "a
separate inquiry" from the cause of his accident, i.e., whether
"the design was unreasonable or defective."  Mem. Supp. Mot. New
Trial at 6.  But the questions of defect and causation are not
"separate inquiries" because, of course, to recover in a products
liability action, the plaintiff must prove that a defect in the
product caused, or substantially contributed to cause, his
injury.  See, e.g., Vatour v. Body Masters Sports Indus., Inc.,
147 N.H. 150, 154 (2001).  It follows that, as this court noted
in its order on the parties' pre-trial motions in limine, "'[a]ny
alleged defect which had nothing to do with plaintiff's injury is
irrelevant.'"  West v. Bell Helicopter Textron, Inc., 967 F.

_____

    [5]In a footnote in a different section of his new trial
motion, West says that excluding this evidence "because of the
absence of expert testimony that [Goodrich's] failure to meet
acceptable failure rates . . . caused [his] accident" was
"improper, and grounds for a new trial in its own right."
Insofar as this statement is intended to suggest that the
evidence of the deficient FOSSA rate was, in fact, relevant to
causation, the suggestion is insufficiently developed to enable
discussion.  See Higgins v. New Balance Athletic Shoe, Inc., 194
F.3d 252, 260 (1st Cir. 1999).

Supp. 2d 479, 502 (D.N.H. 2013) (quoting and adding bracketing to Weir v. Crown Equip. Corp., 217 F.3d 453, 461 (7th Cir. 2000)).[6]

West's theory at trial was not that the ECU was defective because it allowed FOSSA events to occur more often than Rolls Royce had specified or, for that matter, with any particular frequency. Rather, West's liability experts testified that the ECU was defectively designed because, as reflected in exhibit 552 (as well as other documents admitted at trial), Goodrich had tried to reduce the incidence of FOSSA by upgrading the capacitors in the ECU, rather than addressing the "root cause" of the phenomenon, i.e., that the ECU recognized an electrical failure in any of its components as an overspeed event triggering the closure of the overspeed fuel valve. See Tr. Trans. Sept. 10, a.m., at 5-7; Tr. Trans. Sept. 11, a.m., at 124-27, 136-38.

To properly address the "root cause," one of those experts testified, the ECU should have been programmed to recognize FOSSA as a "false event" that turned control of the fuel system over to the pilot, rather than automatically cutting the fuel flow--a design which, had it been in place in West's helicopter, would

---

[6]The court made this observation in the course of excluding evidence that the helicopter West was flying at the time of his accident lacked the upgraded capacitors contemplated by exhibit 552, since "West cannot show that the absence of the upgraded capacitors had any causal connection to his crash." West, 967 F. Supp. 2d at 502. That same reasoning--which West does not question in his new trial motion--led to the exclusion of the "reliability statistics" in exhibit 552, which, as that document makes clear, were based on the pre-upgrade capacitors.

have enabled him to avoid his accident.  Tr. Trans. Sept. 11,
a.m., at 135-38.  Accordingly, the "defect" evidenced by the
"reliability statistics" that West sought to introduce at trial
was not the "defect" that he claimed to have caused his accident.
So this court properly excluded the "reliability statistics" as
irrelevant.  <u>See</u> <u>Weir</u>, 217 F.3d at 460-61.

West also argues that the "reliability statistics" were
"relevant to the credibility of [the] defendants' expert
witnesses," specifically, Millar, who "claimed not to have relied
on his own documents in arriving at the conclusion that FOSSA was
not the cause of [West's] accident."[7]  Mem. Supp. Mot. New Trial
at 6.  Thus, West maintains, "[h]ad the jury received the
unredacted documents, which demonstrated that the ECU was not
meeting Rolls-Royce's standards with regard to the prevalence of
FOSSA, the jury may well have rejected Millar's testimony."  <u>Id.</u>
The court does not follow West's logic.

Again, as West has acknowledged in his new trial motion, the
ECU's failure to meet Rolls Royce's specifications for the
frequency of FOSSA has no relevance to the cause of the accident.
The court is at a loss, then, to see how that fact has any
relevance to the reliability of <u>Millar's opinion</u> as to the cause
of the accident.  Indeed, West's own designated expert witnesses

---

[7]In quoting from West's submissions throughout this order,
this court has taken the liberty of omitting his capitalization
of defined terms.

on that subject did not, as support for their contrary opinions
that a defect in the ECU <u>was</u> the cause of the accident, rely on
the fact that the ECU fell short of the specifications.[8]  Because
that fact simply had no bearing on the reliability of Millar's
opinion as to the cause of West's accident, this court acted
properly by ordering the redaction of exhibit 552 insofar as it
referred to the deficient "reliability statistics."[9]  See <u>MMG
Ins. Co. v. Samsung Elecs. Am., Inc.</u>, 293 F.R.D. 58, 64-65
(D.N.H. 2013) (excluding evidence offered to impeach opposing
expert's opinion as to the cause of an accident where the

---

[8]In fact, one of West's liability experts had stated at his
deposition that a statistic set forth in a different memorandum
from Goodrich to Rolls Royce, which pegged the incidence of FOSSA
at 4.41 occurrences per ten million flight hours, did not mean
that FOSSA was the "most likely" cause of West's accident, and
that, lacking the underlying data, he could not express an
opinion to that effect.  Tr. Trans. Sept. 9, p.m., at 124-25.

[9]West also asserts that "the excluded evidence showed that
[Goodrich] consistently misrepresented the data" and, "therefore,
would go to the credibility of all of [Goodrich's] employees,
calling into question the jury's verdict."  Mem. Supp. Mot. New
Trial at 6.  There are a number of problems with this statement,
including:  (1) again, West has not pointed to any particular
documents, and those the court has been able to identify, on the
face of them, do not show that Goodrich "misrepresented" any
data; at worst, they suggest that Rolls Royce asked Goodrich to
explain how it had arrived at certain calculations, (2) the fact
that Goodrich had revisited its calculations for the statistical
incidence of FOSSA says little if anything about the
"credibility" of the employees who did the initial calculations,
let alone "all of [its] employees," (3) as noted <u>infra</u> this
section, the jury heard other evidence that Goodrich had revised
those calculations, in any event--evidence that West could have
used, if he wished, to argue that the opinions of Goodrich's
witnesses were not reliable.

offering party's own expert had not relied on that evidence in forming his contrary opinion).

Finally, even if this court should not have redacted that portion of exhibit 552 stating that the ECU did not meet Rolls Royce's specifications, that ruling resulted in no cognizable prejudice to West, because the same evidence was admitted from another source. One of West's designated expert witnesses, John Bloomfield, testified that, based on his review of information provided by the defendants, (a) Rolls Royce had required Goodrich to meet a "reliability factor with regard to FOSSA" of 1 event per 10 million flight hours, (b) Goodrich had not met that standard during the "theoretical design phase," when it calculated the failure rate as 1.19 FOSSA events per 10 million flight hours, and (c) by December 2006, Goodrich had revised the probability of a FOSSA event upward to 4.41 occurrences in 10 million flight hours. Tr. Trans. Sept. 9, p.m., at 116-17, 125-27. (It should be noted that this rate, calculated before the capacitors had been upgraded, is even higher than the rate of 1.55 FOSSA events per 10 million hours reflected in exhibit 552.)

In light of Bloomfield's testimony as to the deficient reliability statistics--testimony which went unchallenged during cross-examination--the redaction of the references to deficient reliability statistics from exhibit 552 (or, for that matter, any other exhibit) did not cause substantial prejudice to West that

16

could justify a new trial.  See <u>Hernandez-Torres v. Intercont'l Trading, Inc.</u>, 158 F.3d 43, 49 (1st Cir. 1998) (ruling that excluding cumulative evidence did not cause substantial prejudice).  West's motion for that relief is denied insofar as it relies on the exclusion of the "reliability statistics."

### 2. Cross-examination with operations manual

West also argues that this court erred by permitting the "irrelevant and prejudicial questioning" of his "witnesses" about the "General Operations Manual" for West's employer, Joe Brigham Inc. d/b/a JBI Helicopter Services ("JBI"), as those questions referred to "the purportedly 'proper' or preferred handling of helicopters exposed to snow and ice."  Mem. Supp. Mot. New Trial at 2-3.  West argues that this questioning was irrelevant because "West's or JBI's adherence to any particular standard of care was not at issue in this case since there was no comparative fault or misconduct defense."  <u>Id.</u> at 4.  But, as recounted fully below, West never raised that argument in objecting at trial to the manual, which was not itself admitted into evidence, or to any questions about it.  Nor did he ask for any curative instruction as a result of the questions--only one of which was both objected to and answered (at least by the sole witness identified in West's motion).  Accordingly, the questioning about the manual could entitle West to a new trial only if he could show that it

17

amounted to an error "so fundamental that a gross injustice would result."  Wright, supra, § 2805, at 73.  He has not.

Because the defendants had raised the affirmative defenses of comparative fault and misconduct (as well as the related defense of third-party fault by JBI) in their answers, the court gave (with the prior approval of all parties) a preliminary instruction to the jury outlining the elements of those defenses. But the court observed shortly thereafter that, because these defenses were based solely on West's and JBI's alleged failure to clear snow and ice from the helicopter before the flight, the jury would never have the opportunity to consider that conduct as the basis for any affirmative defense.  See Tr. Trans. Sept. 10 a.m., at 108.  In other words, as counsel for West put it (and counsel for all defendants agreed) during the ensuing colloquy, the jury necessarily had to find that the cause of West's accident was "either snow and ice," in which case they would find for the defendants outright and therefore not need to consider affirmative defenses, or "a defect," in which case they would have necessarily rejected the defendants' claim as to the role of snow and ice in causing the accident.  Id. at 110.

But counsel for West did not ask the court to rule (nor did the defendants agree) that, as a result, they could not introduce any evidence that West or JBI had violated a standard of care in their effort to remove snow and ice from the helicopter.  Indeed,

18

West did not make this argument even when Rolls Royce sought to introduce JBI's manual at trial:  he initially objected to the manual as evidence of a subsequent remedial measure, <u>see</u> Fed. R. Evid. 407, then, when Rolls Royce pointed out that "circuit precedent clearly establishes that Rule 407 does not apply to actions taken by third parties" to the litigation, <u>Espeaignnette v. Gene Tierney Co.</u>, 43 F.3d 1, 5 n.5 (1st Cir. 1994), argued for exclusion "either on pure [Rule] 402 analysis of what [JBI] did in 2013," i.e., after West's accident, or Rule "403 analysis of . . . the prejudice outweighs the probative value when you're talking about a company making a change four years later as a result of litigation."  Tr. Trans. Sept. 16 p.m., at 59-60.

"'It is well-established that an objection on one ground does not preserve [post-trial] review of another ground.'" <u>United States v. Mercado</u>, 412 F.3d 243, 247 (1st Cir. 2005) (quoting <u>Negron v. Caleb Brett U.S.A., Inc.</u>, 212 F.3d 666, 672 (1st Cir. 2010)).  Because, at trial, West did not challenge the manual, or questions about it, as irrelevant because JBI's standard of care was immaterial, he can obtain a new trial on the basis now only if allowing such evidence was plain error.  <u>Id.</u>

Furthermore, as West acknowledges, the manual was not admitted into evidence, in any event, but was merely referred to

by counsel for Rolls Royce in questioning JBI's vice president
and owner, Ray Newcomb.[10]  What West fails to acknowledge is
that--at least when his counsel objected--Newcomb never answered
any questions from counsel from Rolls Royce that referred to the
manual as such, and--even when counsel for West failed to
object--only answered one such question anyway.

   After this court sustained West's objection to the admission
of the manual on relevance grounds, counsel for Rolls Royce twice
asked Newcomb whether he agreed with the statement that "the only
acceptable method for the removal of snow and ice is by placing
the helicopter in a hangar until the frost, ice or snow melts."
Tr. Trans. Sept. 16 p.m., at 132-33.  Newcomb twice said no and,
after the second denial, counsel attempted to impeach him by
asking "Sir, doesn't your general operations manual on page 19-5

_____

   [10]As is the case with its argument about the improperly
excluded "documents," West's new trial motion does not identify
the "witnesses" he means, but simply refers to portions of the
trial transcript.  Those portions, however, cover the examination
of only one witness, Newcomb.  While West's reply memorandum
argues that "the attempt to impeach [West] with JBI's manual
[was] impermissible," Reply Mem. Supp. Mot. New Trial at 4, even
the reply does not refer, by record citation or otherwise, to any
questions that West was asked, by counsel for Rolls Royce or
anyone else, about the manual during his trial testimony, which
spanned three days.  It is not the role of this court to wade
through three days' worth of trial transcript to find the record
support for West's arguments when his own counsel has declined to
undertake that effort.  See United States v. Zannino, 895 F.2d 1,
17 (1st Cir. 1990).  So this court has not considered any claim
by West that he, in addition to Newcomb, was improperly asked
questions about the manual at trial--but the court suspects,
based on its recollection of West's testimony, that any such
claim would fail for the reasons set out in this section.

state exactly"--but this question was interrupted by an objection from West's counsel to "this being read in the presence of the jury," and was not answered.  Id.  Counsel for West later objected to another question from counsel for Rolls Royce about "this document," and, while the objection was overruled, Newcomb did not answer the question, because counsel asked a different one that did not refer to the manual.  Id. at 136.

After a few more questions, counsel for Rolls Royce asked Newcomb, again, whether "the only acceptable method [of] removal of snow and ice is by placing a helicopter in a hangar until the frost, ice or snow melts."  Id. at 137.  Counsel for West objected, but only on "asked and answered grounds"--and then did not object to the next question, "Sir, I'm reading from your manual.  Do you disagree with your manual?"  Id.  Newcomb answered, "there are other ways to de-ice an aircraft," id., at 137-38, and counsel for Rolls-Royce did not ask another question of Newcomb that referred to the manual.

It is extraordinarily difficult to reconcile this record with West's claims that the court "permitted repeated and extensive questioning of [West's] witnesses about [the manual's] contents."  Mem. Supp. Mot. New Trial at 4.  Actually, Newcomb was asked about the manual a grand total of three times:  twice, he did not answer due to objections from West's counsel, and the other time counsel for West did not object.  While Newcomb was

21

also asked three times whether he agreed with a statement that, apparently, appears in the manual, none of those questions identified the manual as the source of the statement[11]--and, in any event, when counsel for Rolls Royce asked such questions, they were either not answered or drew no objection.  And, again, the objections that West did make to the questions about the manual did not assert, as his new trial motion now does, that they were irrelevant because JBI's compliance with any particular standard of care was not an issue in the case, but only because JBI had not issued the manual until after West's accident.

The end result is that, as already noted, West cannot obtain a new trial based on the questioning about the manual unless the questioning amounted to an error "so fundamental that a gross injustice would result."  Wright, supra, § 2805, at 73.  West himself seems to acknowledge as much, calling the questioning "plain error," Mem. Supp. Mot. New Trial at 4--but without even mentioning the stringent elements of the plain-error test, let alone explaining how they are satisfied.  To demonstrate plain error, West must "show (1) that there was error, (2) that it was plain, (3) that it likely altered the outcome, and (4) that is

---

[11]There is no indication in the record that, apart from during the three questions that referred to the manual as such, counsel for Rolls Royce did anything to suggest that the manual was the source of the statement, or even that, while asking about the statement, counsel had the manual in front of her, let alone in view of the jury (who would not have known what it was anyway, since it was not admitted into evidence).

was sufficiently fundamental to threaten to the fairness,
integrity or public reputation of the judicial proceedings."
Sony BMG Music & Entm't v. Tenenbaum, 660 F.3d 487, 502 (1st Cir.
2010).  These "requirements for plain error are extremely
demanding, and in this circuit, it is rare indeed to find plain
error in a civil matter."  Muñoz v. Sociedad Española de Auxilio
Mutuo y Beneficiencia de P.R., 671 F.3d 49, 59 (1st Cir. 2012)
(quotation marks and ellipse omitted).

    Even assuming, without deciding, that allowing the questions
about the manual was error in light of West's non-contemporaneous
argument that evidence of JBI's standard of care was irrelevant,
the remaining elements of the plain error test are wholly absent.
Again, the manual itself was not admitted into evidence or
otherwise displayed to the jury, Newcomb was asked only three
questions that referred to the manual as such, and only one of
those questions was answered.  The notion that a handful of
questions to, and but a single answer by, one third-party witness
about an irrelevant--and hardly inflammatory--subject could have
altered the outcome of a three-week trial with more than two
dozen witnesses is fanciful, to say the least.

    Moreover, the jury was specifically instructed that
"[q]uestions by lawyers are not evidence, unless the witness
specifically adopts the facts set forth in the question," Tr.
Trans. Sept. 26 p.m., at 78--which, as just discussed, Newcomb

never did, even in the one answer he gave.  The court further instructed the jury that it "not being asked to decide whether Mr. West, JBI or any of its employees were negligent, or violated any standard of conduct in their treatment of the helicopter prior to the accident." Id. at 87.  West did not object to these instructions, or request more robust ones.[12]  On this record, West could not possibly hope to show (even if he tried, which he has not) that the limited questioning about the manual "likely altered the outcome" of the trial, let alone that it "threatened the fairness, integrity or public reputation of the judicial proceedings."  Sony BMG, 660 F.3d at 502.  His motion for new trial is denied insofar as it is premised on Rolls Royce's questioning of Newcomb about his company's safety manual.

### 3.    "Lay opinion" testimony

West encounters similar--if not worse--problems with his argument that this court improperly excluded would-be testimony from Newcomb and another one of West's witnesses, Roger Sharkey, a helicopter pilot who investigated the accident.  West claims that "[h]ad they been permitted to do so," these witnesses "would

---

[12]Indeed, West's counsel noted in her summation that the "court has mentioned to you a couple times already and will again . . . that there is no issue in this case about negligence or fault on the part of Mr. West, [his co-workers], or JBI.  This case does not involve a question of whether they were negligent, whether they didn't follow some policy or manual."  Tr. Trans. Sept. 26 p.m., at 31-32.

have testified that "when a helicopter experiences an engine
flameout without a cessation of fuel flow, the helicopter will
show tell-tale signs of fuel spatter" and "because there was no
evidence of fuel splatter on the accident helicopter, the
accident could not have been caused by snow or ice." Mem. Supp.
Mot. New Trial at 7. The problem with this argument, as the
defendants point out, is that the court never prevented these
witnesses from giving any of that testimony, because West never
tried to elicit it, nor, moreover, did he ever proffer it.

"Preserving a claim of error based on exclusion of evidence
requires an adequate proffer, so that the trial and appellate
courts know what evidence is at issue." Osorio v. One World
Techs., Inc., 659 F.3d 81, 91 (1st Cir. 2011). Absent such a
proffer, then, a claim that the trial court erroneously excluded
evidence is waived. See id. Nowhere in West's new trial
memoranda--including his reply, filed in response to the
defendants' objection emphasizing the lack of any proffer--does
he point to anywhere in the trial record where he attempted to
proffer of the testimony he now claims that Newcomb and Sharkey
"would have" given "had they been permitted to do so." The
court's review of the transcript of their testimony reveals that,
in fact, West made no such effort.

It is true that, prior to trial, this court granted one of
the defendants' motions in limine insofar as it sought to

25

exclude, as undisclosed expert testimony, "any opinions from Newcomb and Sharkey as to the cause of West's accident, including that the absence of fuel spatter indicates that ice and snow played no role." West, 967 F. Supp. 2d at 503.  But a pretrial ruling excluding evidence operates to relieve the proponent of his obligation to proffer that same evidence at trial only where "the pretrial proffer is adequate" on its own.  Fusco v. Gen. Motors Corp., 11 F.3d 259, 262-63 (1st Cir. 1993).  Here, West did not make an "adequate" pretrial proffer of opinion testimony by Newcomb and Sharkey as to the cause of the accident.

To the contrary, West's objection to the defendants' motion to exclude undisclosed opinion testimony simply described "the proffered opinions of these Witnesses"--a term defined to embrace not just Newcomb and Sharkey, but also five other potential trial witnesses--on "topics including (without limitation) how they clean ice and snow from helicopters, how to perform an autorotation, what fuel spatter looks like after an engine flameout, or the qualities of a good pilot."  Obj. to Goodrich Mot. in Limine (doc. no. 293) at 19.  Among other deficiencies, this statement fails even to specify which of the seven named "Witnesses" would opine as to which of the four listed subjects. To preserve his argument that evidence should have been admitted, the proponent must, at a minimum, "mak[e] clear the substance of the offer," United States v. Amaya-Manzanares, 377 F.3d 39, 46

26

(1st Cir. 2004), and West's objection to the motion in limine failed to do so.  Accordingly, West cannot obtain a new trial, or any other relief, based on the would-be testimony from Newcomb and Sharkey as to whether snow and ice caused the accident.  See Osorio, 659 F.3d at 91.

Furthermore, even had West sufficiently proffered opinion testimony from Newcomb or Sharkey as to the cause of the accident, those opinions would have been properly excluded as undisclosed expert testimony, despite West's effort to characterize them as lay opinions.  As discussed at greater length in this court's order on the motions in limine, an opinion that "because there was no evidence of fuel splatter on the accident helicopter, the accident could not have been caused by snow or ice," based on the witness's knowledge that "when a helicopter experiences an engine flameout without a cessation of fuel flow, the helicopter will show tell-tale signs of fuel spatter," is self-evidently expert testimony under Rule 702, rather than lay opinion testimony under Rule 701, of the Federal Rules of Evidence.  See West, 967 F. Supp. 2d at 503-04. Because West concededly did not disclose Newcomb and Sharkey as the source of any expert opinions, then, the testimony he now proffers would have been properly excluded.  See id. (citing Harriman v. Hancock County, 627 F.3d 22, 29 (1st Cir. 2010)). West's motion for a new trial is denied insofar as it is based

27

on this court's claimed "exclusion" of any testimony from
Newcomb or Sharkey opining as to the cause of the accident.

### B.   Closing argument

West also argues that he deserves a new trial based on
allegedly improper comments by counsel for Rolls Royce during
her summation.  A new trial based on improper statements in
closing argument requires a showing of prejudice.  See, e.g.,
Rodriguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 38-39
(1st Cir. 2011).  As explained fully below, West has failed to
show that the few remarks from adverse counsel's summation
challenged in his new trial motion caused him prejudice,
particularly in light of the curative instructions this court
gave in response.

West's memorandum in support of his new trial motion
identifies the following statements from counsel's closing
argument as lacking any evidentiary support:

> • after reviewing some of the evidence as to how West
> and other JBI employees had stored the helicopter
> outside, and attempted to clean the resulting snow and
> ice from it, prior to the accident, a statement that "I
> would submit that if you do all that wrong, there's a
> hundred percent chance that you're going to get ice
> into the engine," Tr. Trans. Sept. 26 p.m., at 10-11;
>
> • a statement that one of the Rolls Royce employees who
> testified at trial, "Tom Piercy[,] and the folks in
> Indianapolis make a really good engine," id. at 11; and
>
> • "I would submit that the reason that Rolls-Royce has
> such a sterling reputation for engineering excellence
> is because the outstanding world class engineers like"

28

Piercy, and two of his colleagues who had also
testified, "take pride in their work," id. at 20.

After counsel for Rolls Royce concluded her summation, and the
jury was excused for a recess, counsel for West stated, "there
were several things said over the course of the [defendants']
closing but in particular [Rolls Royce's] closing that I believe
have no support in the evidence." Id. at 24-25. Counsel for
West then "ask[ed] the court to remind the jury again before I
close about the fact that statements may have made been regarding
matters not in evidence and that they must disregard such
statements if they conclude that indeed things were said that
were not in evidence." Id. (emphasis added). As this comment
suggests, this court had already instructed the jury, just before
summations began, that "closing arguments are not evidence. Like
I said, the words lawyers say in court are not evidence . . . .
Your recollection of the evidence is what controls." Tr. Trans.
Sept. 26 a.m., at 17.

In response to West's objection, this court agreed that
counsel for Rolls-Royce had made some statements without
evidentiary support, including the comment that "Rolls-Royce has
a sterling reputation for engineering excellence," but observed
that these statements were not "particularly harmful or
prejudicial." Tr. Trans. Sept. 26 p.m., at 27-28. The court
also ruled that it would not "instruct the jury again prior to
[West's counsel's] closing," but would give counsel for West "a

little bit of leeway" in her summation and "give a good
instruction as part of the charge" on all matters before sending
the jury to deliberate.  Id. at 28.  After noting her objection,
West's counsel proceeded to give her closing argument, stating,

> I must say to you that the comments you have heard in
> closings, as the judge has told you, are not evidence,
> and that there [were] many, many things said which you
> must test against what you actually heard in the
> evidence in this case . . . .  I am suggesting to you
> that you consider with some care whether you have just
> heard statements for which there was no support in the
> evidence.

Id. at 30.  Counsel for West also stated that "you saw that Kurt
West is a good, caring and kind person."  Id. at 31.

After West's counsel finished her summation, the court gave
its final charge to the jury, including the instruction that:

> Arguments and statements by lawyers are not evidence.
> What they have said in their opening statements,
> closing arguments and at other times is intended to
> help you interpret the evidence, but it is not
> evidence.  If the facts as you remember them differ
> from the way the lawyers have stated them, your memory
> controls.

Id. at 77.  This court also instructed the jury that, although
they "heard that Rolls-Royce has a stellar reputation in the
engineering community" and "that Mr. West is a good, kind and
honest man . . . [,] [w]hether anyone is a good or bad person, a
good or bad company, or has a reputation in that regard is not an
issue in this case in any way, shape, or form . . . .  [T]hat
evidence is not admissible, not for you to consider."  Id. at

30

80-81.  West did not object to the substance of these
instructions, or request more robust ones.

On this record, West cannot show that three improper
comments from the closing argument by counsel for one of the
three defendants prejudiced the outcome of the case against
him.[13]  The court instructed the jury that closing arguments were
not evidence, and to disregard them insofar as they deviated from
the evidence, both before closing arguments began and after they
ended--and therefore, both before and after counsel for Rolls
Royce made the challenged statements in her summation--and, in
addition, gave a separate instruction to the jury to specifically
disregard the statement as to Rolls Royce's reputation.  So,
"even if counsel's remarks had the tendency to mislead," or to
distract the jury with the irrelevant subject of Rolls Royce's
reputation, "the brief comments were sufficiently neutralized by
[this court's] curative instructions."  Granfield v. CSX Transp.,
Inc., 597 F.3d 474, 491 (1st Cir. 2010) (ruling that instruction

---

[13]West's reply memorandum refers to an additional comment
from Rolls Royce's counsel's summation, calling it "improper"
because it "contended that failure to follow the [JBI] manual was
a breach of the standard of care."  Reply Mem. Supp. Mot. New
Trial at 1 & n.1.  The court will not consider any argument by
West that this comment was improper, because it was raised for
the first time in reply.  See Doe v. Friendfinder Network, Inc.,
540 F. Supp. 2d 288, 303 n.16 (D.N.H. 2008).  In any event, as
already noted, see Part II.A.2, supra, this court specifically
instructed the jury in the final instructions that whether West
or any of his fellow JBI employees breached any standard of care
was not an issue in the case--an instruction which served to cure
any harm from this additional improper remark, see infra.

to disregard closing arguments insofar as they differed from the
evidence sufficed to address counsel's misstatement of the
evidence in his summation).

Indeed, a curative instruction (rather than other more
drastic relief, such as a mistrial) was precisely the relief that
West requested at trial for the allegedly improper remarks by
counsel for Rolls Royce and, again, West has never challenged the
content of this court's curative instructions.  Instead, West
challenges their timing:  he argues that he deserves a new trial
because the court did not give the instruction <u>before</u> his counsel
gave her closing argument, rather than just <u>after</u> she did so, as
part of the final charge to the jury.  But "[t]he district court
has considerable leeway as to the phrasing and timing of a
curative instruction."  <u>United States v. Palmer</u>, 203 F.3d 55, 59
(1st Cir. 2000).  West fails to demonstrate that this court
exceeded that leeway as to timing here (once again, West has
never challenged the phrasing or the substance of the
instruction) by waiting until the completion of all closing
arguments to tell the jury, as part of the final charge, to
disregard comments by counsel in their arguments insofar as those
comments were unsupported by the evidence.[14]

_____

[14]West states that "[i]nstead of offering the instruction at
the appropriate time . . . the court interrupted counsel for Mr.
West during her closing and instructed, '[Y]ou take your best
recollection of what the testimony was . . . .  Your memory
controls.'"  Memo. Supp. Mot. New Trial at 12 (quoting and adding

West has provided no authority for the notion that a delay so brief in duration could ever work the prejudice necessary to order a new trial, and the court finds that notion exceedingly difficult to accept.  <u>See</u> <u>id.</u> (rejecting the claim that an instruction to cure improper remarks in summation "was insufficient because it did not immediately follow the misconduct" but was "delivered several minutes after the objection," when the instruction "pointedly addressed [counsel's] improper remark").  The court denies West's motion for a new trial insofar as it is based on the challenged statements from Rolls Royce's counsel's closing argument.

---

bracketing and ellipse to Tr. Trans. Sept. 23 p.m., at 43-44). Through the misleading use of an ellipse, this statement conflates the court's instructions to cure the improper remarks by Rolls Royce's counsel (which, again, were delivered as part of the final charge to the jury) with the instruction given during West's counsel's summation, which was directed at an entirely different kind of improper conduct--namely, her displaying to the jury an "unofficial transcript" she had prepared of the trial testimony of one of the defense witnesses.  Tr. Trans. Sept. 23 p.m., at 43.  It was in response to that conduct that the court instructed the jury to "take your best recollection of what the testimony was.  <u>This is an unofficial transcript prepared by trial counsel, but you won't be able to have this transcript or even the official transcript.</u>  Your memory is what controls." <u>Id.</u> at 43-44 (emphasis added to passage omitted from West's quotation).  There was nothing improper about this instruction (in contrast to West's attempt to distort this court's words by omitting an entire sentence from the middle of what was said, which is unfortunate at the least).

## C.    Nondisclosures

West argues that he is entitled to relief because of the defendants' alleged failure to produce information about two subjects prior to trial:  (A) a crash of the same model helicopter he was flying at the time of his accident, that occurred in the Gulf of Mexico on August 13, 2013--just a few weeks prior to the commencement of the trial, and (B) product alerts issued by Bell and Rolls Royce about that helicopter model on January 23, 2014--nearly four months after the end of the trial.  Although West includes the defendants' alleged failure to disclose the August 2013 crash as one of the bases of his motion for a new trial under Rule 59, his memorandum in support of that motion cites Rule 60(b)(3), as well as case law applying that rule, in discussing the subject.  Mem. Supp. Mot. New Trial at 14-15.  West raises the defendants' alleged failure to disclose the information in the product alerts, meanwhile, as the basis for his motion for relief from judgment, which expressly invokes Rule 60(b)(3), as well as Rule 60(b)(2).  As fully explained below, West has not carried his burden to prove his entitlement to relief under Rule 60(b)(2) or (3) on the basis of either the August 2013 accident or the January 2014 alerts.

Before embarking on that analysis, though, the court pauses to note that West also appears to claim, at least in the argument heading to this section of his new trial memorandum, that,

34

putting the August 2013 crash aside, he is entitled to another trial due to the "defendants' failure to timely disclose additional FOSSA events before trial." Mem. Supp. Mot. New Trial at 12 (formatting altered). This refers to the fact that West learned <u>during</u> the trial--not after it--of "three additional FOSSA events in 2013" involving the same model helicopter, engine, and ECU that were involved in his accident. Id. at 13.

West learned this because the court granted counsel for West leave to conduct voir dire examination of Millar about alleged incidences of FOSSA in the relevant products (beyond the six FOSSA events which the court had ruled to be admissible in its order on the parties' pretrial motions in limine. <u>West</u>, 967 F. Supp. 2d at 493-44). During that voir dire, Millar testified to "three acknowledged FOSSA events" that had occurred in 2013 and that were unknown to West prior to hearing that very testimony. Tr. Trans. Sept. 20, p.m. at 98. Over the defendants' objections, the court ruled that counsel for West could cross-examine Millar, in front of the jury, as to these accidents' "locations, dates, and the fact that they were acknowledged FOSSA events," to impeach his testimony on direct examination that "no overspeed power supply FOSSA events had happened since" 2007. Id. at 99-100. West did not seek any other relief as a result of learning of these three 2013 FOSSA events for the first time at trial, despite the court's

invitation to counsel for a proposal for an alternative "remedy to try to address this." Id. at 106. Instead, after the weekend recess that followed, West's counsel cross-examined Millar about the 2013 events in accordance with the ruling. Tr. Trans. Sept. 23, a.m., at 4-5, 9-10.

Having made this deliberate choice at trial, West cannot now complain, as he does in support of his new trial motion, that the court's ruling "did not allow [him] to acquire or explore factual similarities between any of those events and [his] case." Mem. Supp. Mot. New Trial at 13. "The appropriate remedy for parties who uncover discovery violations is not to seek reversal after an unfavorable verdict but a request for continuance at the time the surprise occurs." U.S. Fid. & Guar. Co. v. Baker Material Handling Corp., 62 F.3d 24, 29 (1st Cir. 1995). So, by deciding against seeking a continuance--or any other relief that might have enabled him "to acquire or explore factual similarities" between his accident and the 2013 FOSSA events disclosed for the first time at trial--West has waived any claim for a new trial based on that belated disclosure. See id.

### 1. August 2013 crash

West asserts that, just after the trial, he discovered that "an additional Bell 407 had crashed in the Gulf of Mexico on August 13, 2013," in an incident that Millar had not mentioned during his trial testimony. Mem. Supp. Mot. New Trial at 13.

36

West learned this information by searching the NTSB's on-line
database, retrieving the date of the accident, the make and model
number of the helicopter, and the name of the air carrier, but
little else.  See Aff. Joan A. Lukey Supp. Mot. New Trial, Ex. A.
Counsel for West attests that she then engaged in "email and
phone communications" with the "director of maintenance" for the
named carrier, and that this person--whom West does not otherwise
identify--"confirmed that the event was indeed an uncommanded
shutdown with a sudden loss of power shortly after lift-off from
an oil rig in the Gulf of Mexico.  No mechanical or engine (non-
FADEC) issues were identified."  Id. at 2.

The defendants, for their part, have responded with an
affidavit from Millar, who attests that, to his knowledge, the
NTSB did not even contact Goodrich about the August 2013 crash
until September 9, 2013, after trial had already begun, and that
(aside from a report documenting this contact and some emails
among the parties attempting to schedule a download of the data
from the affected helicopter's ECU) Goodrich had no documents in
its possession, custody, or control about the crash at any time
before the trial ended.  Aff. Bruce Millar Supp. Obj. Mot. New
Trial at 1-2.  Millar further attests that, to his knowledge,
nobody at Goodrich knew anything else about the August 2013 crash
at any time prior to the end of the trial.  Id. at 2.

37

This record falls woefully short of clear and convincing evidence that the defendants engaged in culpable misconduct by failing to disclose the August 2013 crash before the end of the trial.  To start with, West has failed to show that information about that accident was even responsive to any of his discovery requests.  He relies on his request to Bell for the production of documents "relating to any other accident involving a Bell 407 helicopter and . . . an alleged uncommanded shutdown," Mem. Supp. Mot. New Trial at 14, but he does not even claim--let alone provide any evidence--that Bell even became aware of the August 2013 accident before trial ended.  A footnote in his memorandum attempts to address this shortcoming by citing to his request to Goodrich to produce documents "relating to any other accident involving the model of the Subject Engine and . . . an alleged uncommanded shutdown," but does not offer anything besides West's own "understanding" that the helicopter in the August 2013 accident was equipped with the "Subject Engine."  Id. at 14 n.16.

In addition, West has provided no evidence that the August 2013 accident involved "an alleged uncommanded shutdown." Rather, he offers only his own counsel's account of a statement from an unnamed "director of maintenance" at the company operating the helicopter that "the event was indeed an uncommanded shutdown," without even attempting to establish how that person came by such knowledge.  As such, the statement in

counsel's affidavit is double hearsay that is not "evidence" at all, see Fed. R. Evid. 801, 802, let alone the clear and convincing evidence necessary to prove that the defendants withheld information in the face of a discovery request for it.

Moreover, whatever the quality of the "evidence" that West acquired after the trial to suggest that the August 2013 crash involved an "alleged uncommanded shutdown," he has provided nothing--not even double hearsay--to suggest that Goodrich (or any other defendant) knew as much prior to or during the trial. Without such evidence, of course, West cannot establish that any of the defendants engaged in culpable misconduct by failing to produce documents about the August 2013 incident before the trial ended--even if West could show, based on information he acquired after that point, that those documents would have been responsive to his requests about other "alleged uncommanded shutdowns." While West asserts in his motion that, based on the data in the NTSB's on-line database, the August 2013 accident "appeared, at the very least, to be an uncommanded shutdown," that assertion is unaccompanied by a citation to anything, let alone something of evidentiary value, Mem. Supp. Mot. New Trial at 13, and the screenshot from the database that West has submitted contains nothing suggesting that conclusion, see Aff. Joan A. Lukey Supp. Mot. New Trial, Ex. A.  Millar, of course, says that, before the trial ended, Goodrich knew nothing about the August 2013 event

39

aside from that it had happened and that the NTSB was investigating, <u>see</u> Aff. Bruce Millar Supp. Obj. Mot. New Trial at 1-2, and West has offered nothing to call that claim into doubt.

In sum, then, West has failed to come forward with any evidence--let alone clear and convincing proof--that the defendants engaged in culpable misconduct by failing to disclose information about the August 2013 accident before the close of the trial.[15]  That deficiency alone is enough to doom his request for relief under Rule 60(b)(3) insofar as it is premised on the August 2013 crash.  <u>See</u>, <u>e.g.</u>, <u>Tiller v. Baghdady</u>, 294 F.3d 277, 283 (1st Cir. 2002).  For largely the same reasons, West has also failed to satisfy the second prerequisite for that relief, i.e., that the defendants' failure to produce whatever information they possessed about the August 2013 accident before the verdict "substantially interfered with [his] ability fully and fairly to prepare for, and proceed at, trial."  <u>Anderson</u>, 826 F.2d at 926.

---

[15]West says that "at a minimum, the court must allow additional discovery or conduct a hearing regarding the August 2013 accident and any other undisclosed uncommanded shutdowns of a Bell 407 helicopter."  Mem. Supp. Mot. New Trial at 15.  While this court has the "discretion to permit preliminary discovery and evidentiary proceedings" to resolve a claim of fraud or misconduct under Rule 60(b)(3), that relief is not appropriate unless the "the record evidence demonstrates a colorable claim of fraud" or misconduct.  <u>Pearson v. First NH Mtg. Corp.</u>, 200 F.3d 30, 35 (1st Cir. 1999).  As just discussed, West has come forward with <u>no</u> record evidence to that effect (such as, for example, an affidavit from the unidentified maintenance director at the carrier whose helicopter was involved in the December 2013 accident explaining why it was "indeed an uncommanded shutdown"), so he is entitled to no additional discovery or other relief.

Again, the state of the record is that, prior to the close
of trial, Goodrich knew only that an accident involving a Bell
407 had occurred on August 13, 2013, in the Gulf of Mexico.  See
Aff. Bruce Millar Supp. Obj. Mot. New Trial at 1-2.  Those facts
would not even have been admissible at trial, at least in the
absence of additional evidence showing a substantial similarity
between the August 2013 crash and West's accident.  See West, 967
F. Supp. 2d at 493-94 (applying Moulton v. Rival Co., 116 F.3d
22, 26-27 (1st Cir. 1997)).  Once again, West has come forward
with no such evidence.  Aside from the double hearsay set forth
in his counsel's affidavit, in fact, West has no proof that the
August 2013 accident even involved an uncommanded shutdown, let
alone a FOSSA event.  Without such evidence (at a minimum), West
cannot show that the information Goodrich possessed during trial
as to the August 2013 accident was even relevant--and a party
cannot obtain a new trial based on his adversary's failure to
disclose irrelevant evidence.  See Anderson, 862 F.2d at 924.

Nor has West come forward with anything to suggest that,
had Goodrich disclosed the fact that the accident occurred prior
to the close of trial (and, again, Goodrich did not even know
that until September 9, when trial was already underway), this
disclosure would have enabled him to obtain additional
information about the accident helpful to his case.  Indeed, West
has failed to make the slightest showing that such helpful

41

evidence emerged after the trial ended, let alone while it was

ongoing.[16]  West offers strictly speculation, not only that the

August 2013 accident was "a potential FOSSA event," but that the

data from the incident recorder from the affected helicopter

would have either revealed an actual FOSSA event or, instead,

been similar to the data retrieved from the helicopter involved

in West's accident (thus providing support for his theory that a

FOSSA event can have occurred even if the incident recorder does

not show it).  Mem. Supp. Mot. New Trial at 15.

"To warrant a serious inference that [a] case would have

proceeded differently but for the [nondisclosure] at issue,

something far more specific and telling is required than general

speculation."  Roger Edwards, LLC v. Fiddes & Sons Ltd., 427 F.3d

129, 136 (1st Cir. 2005).  Because West has provided nothing

more, he has failed to show he merits relief under Rule 60(b)(3)

based on the August 2013 accident,[17] see id., even putting aside

_____

[16]West acknowledges that the data from the incident recorder
involved in the August 2013 crash was not even scheduled to be
downloaded until November 2013, more than a month after trial
concluded.  Aff. Joan A. Lukey Supp. Mot. New Trial, at 2.
While, theoretically, West could have requested a continuance to
allow the investigation to proceed, he does not suggest that he
would have done so, and, as already discussed, West did not even
request such relief when he learned at trial of three additional
accidents that Goodrich acknowledged to be FOSSA events.  Nor, as
discussed infra, does West offer anything beyond speculation to
suggest that the results of the investigation into the August
2013 accident would have helped his case.

[17]This failure is likewise fatal to any claim by West for
relief under Rule 59 or Rule 60(b)(2) on the theory that the

his failure to show culpable misconduct by Goodrich in not disclosing the occurrence of the accident before trial ended.

### 2.    January 2014 product alerts

As an additional basis for relief under Rule 60(b)(3), as well as under Rule 60(b)(2), West relies on product alerts Bell and Rolls Royce issued on January 23, 2014, nearly four months after the trial ended.  Bell's alert states, in relevant part, that Bell "has been made aware of a potential condition where a false engine overspeed protection system activation could occur," explaining that the alert "introduces the installation of an overspeed adapter to reduce the likelihood of a false overspeed activation as well as introducing a recurring functional check of the overspeed protection circuits within the" ECU.  Mot. Rule 60 Relief, Ex. A, at 1.  Rolls Royce's alert states, again in relevant part, that "[t]he adapter modifies the overspeed protection system to reduce the likelihood of a false overspeed activation," explaining that "[t]he adapter generates an open circuit between the ECU and the HMU [hydromechanical unit] that disconnects the low side switch of the channel A

---

August 2013 accident amounts to newly discovered evidence.  "The same standard applies for establishing that ground for relief, whether the motion is under Rule 59 or Rule 60(b)(2)."  11 Wright, supra, § 2808, at 112 (footnote omitted).  As the Court of Appeals has observed, this standard requires a showing of prejudice greater than Rule 60(b)(3), which "is more lenient than its Rule 60(b)(2) counterpart."  Anderson, 862 F.2d at 924 n.10.

overspeed circuit and the high side switch of the channel B
overspeed circuit in the ECU." <u>Id.</u>, Ex. B, at 1.

West argues that these alerts entitle him to relief under
either Rule 60(b)(2), which allows for relief from a judgment
based on newly discovered evidence, or Rule 60(b)(3), which, as
just discussed at length, allows for that relief based on the
prevailing party's culpably withholding discoverable evidence.
But it is difficult to discern from West's briefing on the motion
precisely what that "evidence" is.  In a footnote to his
memorandum in support of the motion, West states:

> [he] is not contending in this motion that the alerts
> themselves constitute "new evidence," but rather that
> the information disclosed in them is.  Nor is he
> contending in this motion that the hardware and testing
> procedure modifications in the alerts are evidence of a
> "fix" that would have prevented his accident.  Rather,
> for purposes of this motion, [West] is contending that
> defendants have newly acknowledged that 1,3511 [*sic*]
> Bell 407s, <u>including the accident helicopter</u>, are
> susceptible to a previously undisclosed design defect
> in the overspeed circuitry.

Mem. Supp. Mot. Rule 60 Relief at 2 n.1.

In their objection, however, the defendants dispute West's
position that the alerts "disclose a new and previously
unreported mechanism of FOSSA."  Mem. Obj. Mot. Rule 60 Relief at
2.  In fact, the defendants have submitted affidavits from Millar
(as well as his counterparts at Rolls Royce and Bell) attesting
that the alerts do not describe a previously unknown cause of
FOSSA but, rather, a new way to address the known cause of FOSSA,

44

which is--as West argued at trial, <u>see</u> Part I.A, <u>supra</u>--failures
of the electronic components in the ECU power supplies.  <u>See</u> Aff.
Bruce Millar Supp. Obj. Mot. Rule 60 Relief at 1-2.  As Millar
explains, the alerts address this problem through "the
disconnection of two of the four overspeed system drivers" so as
to "[l]eave [just] one driver associated with the main power
supply and one driver associated with the overspeed power
supply," thereby "reduc[ing] the possibility of a FOSSA event
caused by component failures in one of the power supplies."  <u>Id.</u>

Importantly, in his reply, West does not take issue with
this characterization of the alerts.  Instead, he maintains:

> it is immaterial to this motion whether the opening of
> one of two closed circuits is characterized as a
> circuitry design defect, or whether the change is
> indicative of an over-all poor FADEC design because
> components are known to fail and the resulting errant
> signals are twice as likely to reach the overspeed
> solenoid with redundant avenues.  Either way, these
> 1,351 helicopters, including the accident helicopter,
> have a potential condition where a false engine
> overspeed protection system activation could occur.

Reply Mem. Supp. Mot. Rule 60 Relief at 2-3.[18]

---

[18]The court takes this as a withdrawal of the assertions in
West's opening memorandum that the "circuitry problem is an
independent mechanism for FOSSA distinct from hardware component
failures" and that, as a result, "the number of FOSSA events, and
therefore the rate at which such events occur, is greater than
defendants represented at trial," so as to "increas[e] the
statistical probability of FOSSA as the cause of [his] accident."
Mem. Supp. Mot. Rule 60 Relief at 6-7.  In any event, these
assertions were admittedly based on West's "assum[ing]" a "fact"
that "is not possible to glean" from the alerts themselves,
namely, that the "circuitry problem is an independent mechanism
for FOSSA," <u>id.</u>, so, not only has that "fact" been refuted by the

But the fact that the defendants' products "have a potential condition where [FOSSA] could occur," or, as West puts it elsewhere in his briefing on the motion, are "susceptible to FOSSA," id. at 4, is not a new fact--as is clear by now, it was a fact that was disclosed in, among other places, documents produced to West in discovery, see Part II.A.1, supra, and Millar's testimony at trial, see Part II.C, supra.[19]  It is also not news that a recognized cause of FOSSA is that "components are known to fail" in the ECU, creating "errant signals" that can "reach the overspeed solenoid."  Indeed, as is also clear by now, that was West's theory at trial, and precisely why and how his experts testified that the defendants were responsible for his accident, i.e., that they had wrongly tried to reduce the risk of FOSSA by reducing the failure rate of the components in the ECU rather than by reconfiguring the software.  See Part I, supra.

Furthermore, West himself cites Millar's trial testimony where, in response to a question from West's counsel whether

---

defendants' sworn submissions, it had no support to begin with. Accordingly, the court rejects any argument West is still making that the alerts disclose an "independent mechanism for FOSSA distinct from hardware component failures."

[19]West makes much of the fact that the serial number of the helicopter he was flying at the time of his accident is in the range of Bell 407 serial numbers to which the alerts are directed.  The court fails to appreciate the significance of this fact--so far as the court understands, documents and testimony provided by the defendants and their witnesses before and at trial revealed the potential for FOSSA in all Bell 407s equipped with same engine and ECU as the one involved in his accident.

FOSSA is "a short of a component, a leakage of some kind in the ECU, [that] can affect the overspeed protection system," he responded, "Yes.  A component in a power supply can--has caused the FOSSA condition."  Reply Mem. Supp. Mot. Rule 60 Relief at 4 n.4 (quoting Tr. Trans. Sept. 20, p.m., at 46-47).  While West asserts that this testimony admits "only that there could be, and had been in the past, components that caused FOSSA," id. at 4 (emphasis omitted), the court fails to appreciate the distinction between that fact and what West says the alerts have revealed.

West's position seems to be that, because the defendants did not, at trial, "acknowledge unequivocally that FOSSA events result from failures of component parts in the engine's FADEC which result in errant closure of the overspeed solenoid," the fact that they have done so in the alerts (at least as West interprets them) entitles him to relief.  Reply Mem. Supp. Mot. Rule 60 Relief at 3-4.  But the alerts' "acknowledgment" cannot serve as newly discovered or previously undisclosed evidence for the purposes of Rule 60(b)(2) or (3).  As just noted, West has disclaimed any argument that "the alerts themselves constitute 'new evidence,'" Mem. Supp. Mot. Rule 60 Relief at 2 n.1, and as "evidence that came into existence after the judgment," they plainly are not.  Rivera v. M/T Fossarina, 840 F.2d 152, 156-57 (1st Cir. 1988).  Of course, documents created after the entry of judgment can reveal facts that were themselves in existence prior

to the judgment, and therefore potentially qualify as "newly discovered evidence" under Rule 60(b)(2).  See 12 James William Moore et al., Moore's Federal Practice § 60.42[3][a], at 60-126 (3d ed. 2007).  But even if, on this theory, the alerts evince the defendants' pre-judgment awareness of the potential for FOSSA in their products due to the failure of electronic components in the ECU, West's motion still fails.  Again, West received evidence before trial that the defendants were in fact aware of that problem (including in documents they produced to him in discovery) and, indeed, presented it at trial in support of his theory that the defendants knew of that problem but failed to properly remedy it.

West also seems to suggest that the alerts reveal the defendants' pre-judgment knowledge that the then-existing configuration of circuitry in the ECU (i.e., with four drivers connected to the overspeed solenoid instead of two) made FOSSA "more likely--apparently twice as likely--to result if a component failure occurred because there were two circuits, instead of one, conveying current between the ECU and the overspeed solenoid."  Reply Mem. Supp. Mot. Rule 60 Relief at 4. But, even assuming that the alerts do reveal the defendants' awareness of this fact,[20] and, furthermore, that they came by

---

[20]It is worth noting that neither the alerts nor the affidavits the defendants have submitted to explain them state that halving the number of circuits connected to the solenoid

this awareness prior to the end of the trial, West has still failed to show that he is entitled to relief under either Rule 60(b)(2) or Rule 60(b)(3) as a result.

As discussed at the outset of this section, a party seeking relief from judgment on the basis of newly discovered evidence must prove, among other things, that "the evidence is of such a nature that it would probably change the result were a new trial to be granted." U.S. Steel, 315 F.3d at 52. Without acknowledging this standard, West argues that the jury "was forced to make [the] determination" of "whether the FADEC was a safe product or whether it was instead defective" without the evidence he perceives in the alerts "relating to the susceptibility of [his] helicopter to FOSSA and the enhanced--likely doubled--likelihood of FOSSA in the event of a component failure." Reply Mem. Supp. Mot. Rule 60 Relief at 5. But, as already noted, the jury was not tasked merely with determining whether some defect existed in the defendants' products, but whether such a defect caused West's accident. See Part II.A.1, supra (citing Vatour, 147 N.H. at 154.) As also already noted, West expressly disclaims any theory that "the hardware and testing procedure modifications in the alerts,"

---

necessarily halves the risk of FOSSA and, while that conclusion does not seem unreasonable by any means, it would seem to need support from something aside from the assertions of counsel in a brief, if not expert testimony. But West has not offered any evidentiary support for his interpretation of the alerts.

including the elimination of the redundant circuits, "are evidence of a 'fix' that would have prevented his accident." Mem. Supp. Mot. Rule 60 Relief at 2 n.1.  So even if the redundant circuitry in the ECU was a defect--and it should be noted that West's experts, who studied the configuration of the circuitry as part of their work on the case, never themselves identified any such defect--then it was a defect that did not cause West's injuries.  Accordingly, evidence of that "defect" (or, more precisely, the defendants' awareness of it) could not have changed the outcome of the trial.  For that reason alone, this evidence cannot be the basis for relief under Rule 60(b)(2). See <u>Mitchell</u>, 141 F.3d at 18.

The acknowledged lack of any causal connection between the redundant circuitry and West's accident also disentitles him to any relief under Rule 60(b)(3) on the theory that the defendants culpably withheld their knowledge of that alleged defect from West before or during the trial.  Assuming that West could prove the defendants' culpability by clear and convincing evidence (a point that the defendants vigorously contest and that this court need not and does not decide), he cannot obtain relief under Rule 60(b)(3) unless he also proves by a preponderance of the evidence that this misconduct "substantially interfered with [his] ability fully and fairly to prepare for, and proceed at, trial." <u>Anderson</u>, 826 F.2d at 926.  West has failed to carry that burden.

Again, evidence of an additional defect (or the defendants'
awareness of a defect) in the ECU is inadmissible unless the
defect contributed to West's accident, see Part II.A.1, supra
(citing Weir, 217 F.3d at 460-61), and West is expressly not
making that claim.  As also mentioned already, a party cannot
obtain a new trial based on his adversary's failure to disclose
irrelevant evidence, at least without a showing that the
non-disclosure nevertheless substantially interfered with the
movant's trial preparation or presentation.  See Anderson, 862
F.2d at 924.  Because West has failed to make that showing, his
motion for relief from judgment is denied, insofar as it is
premised on the alleged disclosure of an additional defect in the
ECU in the January 2014 alerts.

**D.   Failure to warn and res ipsa loquitur**

In further support of his new trial motion, West argues that
this court erroneously refused to instruct the jury on theories
of failure to warn and res ipsa loquitur, ruling that he had
failed to present sufficient evidence for a jury to find in his
favor.  "The standard for determining whether a factual issue is
sufficiently contested to require an instruction is identical to
the standard for determining whether a factual inquiry prevents
the entry of judgment as a matter of law."  Wilson v. Maritime
Overseas Corp., 150 F.3d 1, 10 (1st Cir. 1998).  Judgment as a
matter of law, in turn, is appropriate where "a party has been

51

fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  As fully explained below, West did not introduce (or, in the case of his warning claim, proffer) adequate evidence at trial for a reasonable jury to have found in his favor on either his failure-to-warn or his res ipsa loquitur theories, so this court correctly declined to instruct the jury.

### 1.  Failure to warn

New Hampshire law requires that the user of a product "be adequately and understandably warned of [its] concealed dangers" by its manufacturer.  Brochu v. Ortho Pharm. Corp., 642 F.2d 652, 656 (1st Cir. 1981) (citing Thibeault v. Sears, Roebuck & Co., 118 N.H. 802, 808 (1978)).  To recover for a manufacturer's failure to give an adequate warning, however, a plaintiff must prove that "the failure to warn adequately was a proximate cause" of his injuries.  Id.  It follows that, "if a user is already aware of the dangers" of using a product, "the lack of warning is not the proximate cause of the injury" he suffers when those dangers become manifest.  In re Prempro Prods. Liab. Litig., 514 F.3d 825, 830 (8th Cir. 2008) (quotation marks omitted); see also, e.g., 2 Louis R. Frumer & Melvin I. Friedman, Products Liability § 12.07[4], at 12-199--12-202 (rev. ed. 2001 & 2013 supp.) (citing additional cases).

Based on these principles, the court declined to give instructions that West had included in his written requests, entitled "Negligence--Manufacturer's Duty to Warn" and "Strict Liability--Failure to Warn." West's Prop. Jury Instr. at 12, 20 (typeface altered). As the court explained at the on-the-record portion of the charging conference, the defendants' duty was "to warn of a risk of injury," i.e., by "a power cutoff" in the engine, rather than "the precise cause of the risk," i.e., a FOSSA event. Tr. Trans. Sept. 27, 2013, at 5. West, however, testified at trial to his awareness, "as part of [his] training and experience as a pilot[,] that something might go wrong, [he] could lose engine power or something else that would cause [him] to go into an autorotation and put the helicopter down." Tr. Trans. Sept. 18, p.m., at 23. Indeed, Rolls Royce's operation and maintenance manual for the engine installed in the helicopter West was flying at the time of his accident specifically warns that the operator may need to "make an autorotational landing in case of power loss or engine failure" (capitalization omitted) Ex. 544, at 27. Thus, as the court ruled at trial, West was aware--in part because the product manual told him--of the danger that the engine could lose power during flight, necessitating an autorotation. Tr. Trans. Sept. 27, 2013, at 5-6. That was, of course, precisely the danger that emerged to cause West's accident, i.e., the engine lost power, forcing him to land the

helicopter through an autorotation procedure that left him with physical and psychological injuries.

Needless to say, a plaintiff cannot make the required showing that his "accident would not have happened had [the defendant] adequately warned him of the danger of using" its product where "the very danger of which [the defendant] had warned came to pass, causing his injury." Coleman v. Ford Motor Co., No. 11-359, 2012 WL 4757889, at *3 (D.N.H. Oct. 5, 2012). West nevertheless states that any "warnings with regard to flameouts generally"--and, presumably, his own admitted knowledge as to "flameouts generally," i.e., that they could occur during flight and necessitate landing by way of autorotation--were not fatal to his failure-to-warn theory, since FOSSA "is factually distinct from other flameouts because the auto-relight system is programmed to shut itself off in circumstances that attach to both real and false overspeed events." Mem. Supp. Mot. New Trial at 17. This statement is unexplained, by way of citation to the record or otherwise, but, as best the court can understand West's point, it seems to be (as he articulated at the charge conference) that the jury could rationally have found that, while the ECU is programmed to attempt to automatically re-ignite the engine following garden-variety flameouts, a flameout due to FOSSA will not trigger this automatic relight function. See Tr. Trans. Sept. 27, a.m., at 8.

54

But West was not warned merely that a flameout could occur during flight, triggering the automatic relight system--he was warned that a flameout could occur during flight, necessitating an autorotational landing.  That, in essence, is the worst-case scenario a pilot can face as a result of a flameout since, as far as the court understands the evidence on this point (which, again, West has not endeavored to explain in his new trial motion), an autorotational landing is not necessary if the relight function successfully restarts the engine to allow the helicopter to continue flying.  It follows that, again, West was warned, and admittedly knew, about the risk of exactly the danger he encountered:  a flameout of the engine during flight that necessitated an autorotation.

West also argues, as he did at the charge conference, that he "would have testified that he would not have flown the Bell 407 equipped with the [relevant] FADEC had he known about FOSSA."[21]  Mem. Supp. Mot. New Trial at 18.  This argument

_____

[21]At trial, this court excluded this proffered testimony as inadmissible speculation based on the decision by the Court of Appeals in Wilson v. Bradlees of New Eng., Inc., 250 F.3d 10 (1st Cir. 2001).  There, the Court of Appeals upheld the exclusion--as "speculative and not based on [the witness's] contemporaneous perceptions"--of testimony by the purchaser of a sweatshirt that had caught fire "that [if] the sweatshirt displayed a warning label [as to its flammability], she would have acted differently," including "by not purchasing the sweatshirt at all."  Id. at 15 n.8.  In his motion for new trial, West attempts to discredit Wilson, largely by relying on what he reads as contrary authority from other jurisdictions, as well as to distinguish it by pointing out that, "once he learned about

55

ignores the fact that, again, West knew about the <u>danger</u> that a
FOSSA event--or any other problem that causes a loss of engine
power--produces, i.e., a mid-air flameout requiring an
autorotational landing.

As noted at the outset of this section, "a user must be
adequately and understandably warned of concealed <u>dangers</u>" from a
product.  <u>Brochu</u>, 642 F.2d at 656 (emphasis added).  West
provides no authority or argument in support of the notion that,
in addition to warning users of a product's dangers, a
manufacturer also must also advise them of the precise mechanism
that brings those dangers about.  To the contrary, so long as the
plaintiff was aware of the danger of injury from using a product,
or using a product in a particular way, it is immaterial whether
he also knew of the precise manner in which the injury could
occur.  <u>See</u> <u>Clarke v. LR Sys.</u>, 219 F. Supp. 2d 323, 329-30
(E.D.N.Y. 2002) (granting summary judgment against failure-to-
warn claim arising out of plaintiff's injury to his hand from the
"nip point" between a pulley and a moving belt carrying blades

---

FOSSA," he stopped flying the Bell 407.  Mem. Supp. Mot. New
Trial at 18-20.  The court finds these arguments unpersuasive,
and stands by its ruling at trial that <u>Wilson</u> is controlling
authority that it is inadmissible speculation for a plaintiff to
testify that, had he been warned of a product's dangers, he would
not have used it (even if, as the court suspects is almost always
the case, the plaintiff in fact stopped using the product after
he learned of its danger by suffering an injury).  Regardless of
whether that ruling was correct, though, West <u>had</u> been warned of
the relevant danger, as discussed at length in the main text.

through a machine because he "was aware that putting his hand on [the belt] could result in significant injury--it does not matter whether this harm would be from the blades or the nip point").

The bottom line is that West was warned, and admitted knowing, that a loss of engine power during flight could force him to make an autorotational landing--which is precisely the manner in which he claimed that his accident, and the resulting injuries, occurred.  No "failure to warn" on the part of the defendants, then, could have proximately caused these injuries. This court acted properly in refusing to instruct the jury on West's failure-to-warn theory.[22]  See Wilson, 250 F.3d at 14-15; see also Fed. R. Civ. P. 50(a) advisory committee's note (1991) (explaining that Rule 50(a) should be applied where a party is "unable to carry a burden of proof that is essential to [his] case").  Insofar as it is based on that ruling, West's motion for a new trial is denied.

---

[22]In opposing West's motion, the defendants argue, as they did at trial, that his failure to warn claim was deficient in an additional respect--the lack of any expert testimony as to the need for a warning.  See Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 27 (1st Cir. 2006) (citing Lemay v. Burnett, 139 N.H. 633, 634-35 (1995)).  The court need not reach this argument, since, regardless of whether West had adequate proof of the need for a warning, he had no proof that the lack of any warning, even were one needed, proximately caused his injuries.

###### 2.   **Res ipsa loquitur**

West also argues that the court erred by failing to instruct the jury as to res ipsa loquitur.  As West acknowledges, "[f]or that doctrine to apply it is necessary that (1) the accident be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an instrumentality within the exclusive control of the defendant; and (3) other responsible causes are sufficiently eliminated by the evidence." Rowe v. Pub. Serv. Co. of N.H., 115 N.H. 397, 399 (1975).  In declining to instruct the jury on this theory, the court agreed with the defendants that "the exclusive control of the instrumentality requirement just could not be met under the state of this record."  Tr. Trans. Sept. 27, 2013, at 3-4.

The "instrumentality" that caused West's accident was the helicopter, which, at the time of the accident, was in his control and, in the days just prior to the accident, was in the control of other employees of JBI.  As discussed supra, the defendants introduced evidence, including expert testimony, that it was West's and JBI's treatment of the helicopter prior to his flight, including their failure to properly clean ice and snow from it, that caused the accident.  New Hampshire does not allow the use of res ipsa loquitur "when the instrumentality is no longer in the exclusive control of the defendant and where someone else's negligence may cause or contribute to cause the

58

accident." <u>Smith v. Coca Cola Bottling Co.</u>, 97 N.H. 522, 524 (1952).  Because that was the state of the record here, this court correctly declined to instruct the jury on res ipsa loquitur.  <u>See</u> <u>id.</u> (upholding non-suit of a claim, premised on res ipsa loquitur, for injuries plaintiff suffered when a soda bottle exploded in a case he was removing from the defendant's truck); <u>see also</u> <u>McConchie v. Samsung Elecs. Am., Inc.</u>, No. 99-40, 2000 WL 1513777, at *3 (D.N.H. Aug. 11, 2000) (granting summary judgment against negligence claim, premised on res ipsa loquitur, arising out of fire allegedly started by defective oven "because when the accident occurred, the oven was installed in the kitchen of the plaintiffs' house and was not in the exclusive control of the defendants," who manufactured and sold it).  West is not entitled to a new trial based on this court's refusal to instruct the jury on the doctrine of res ipsa loquitur.

### E.   Ex parte submissions

Prior to the start of the trial, this court ordered that "the parties may file, under seal and ex parte at Level II [under this court's rules for filing under seal, L.R. 83.12(b)(2)] memoranda calling and focusing this court's attention on any particular issues the respective parties believe will be pertinent to the court's consideration of any expected Rule 50 motions, citing applicable authority and referring to evidence the parties believe will be presented (or not presented) at

trial." Order of Aug. 19, 2013, at 4. The court explained that these memoranda would be "unsealed and exchanged by the parties upon the filing or making of any Rule 50 motion." Id. This procedure was discussed with--and agreed to by--all counsel at the off-the-record portion of the final pre-trial conference.

West concedes that he "did not initially object to the [final pre-trial] order." Mem. Supp. Mot. New Trial at 23 n.21. In fact, West did not object to the order permitting the ex parte submissions at any point during the trial, and he does not claim otherwise. To the contrary, West availed himself of the opportunity to make his own ex parte submission in accordance with the order. This submission, moreover, did not simply argue that West would present sufficient evidence to survive any anticipated Rule 50 motions by the defendants. It affirmatively argued that the expected trial evidence would support the entry of judgment as a matter of law in West's favor as to several issues, including the defendants' liability. Pl. Ex Parte Rule 50 Memo. at 2.

West nevertheless complains that he "participated in sixteen days of trial, a Rule 50 conference and a charging conference without the opportunity to see the arguments made by opposing counsel, let alone respond to them." Mem. Supp. Mot. New Trial at 23. But, again, West knew when he agreed to the procedure set forth in the final pre-trial order that he would indeed be trying

60

his case without first seeing the arguments presented in the defendants' submissions, just as they would be trying their cases without first seeing the arguments presented in his.  And, as soon as the court began hearing argument on the defendants' Rule 50 motions, it ordered the ex parte submissions unsealed, as contemplated by the final pretrial order.[23]  <u>See</u> Tr. Trans. Sept. 26, 2013, a,m., at 6.

The procedure the court followed as to the parties' ex parte submissions, then, was the very procedure that West had acquiesced in--and, for that matter, taken advantage of--from the outset.  It follows that West cannot obtain a new trial based on this court's consideration of the defendant's ex parte submissions.  <u>See</u>, <u>e.g.</u>, <u>Venture Tape Corp. v. McGills Glass Warehouse</u>, 540 F.3d 56, 62 (1st Cir. 2008).

Even putting that problem aside, however, West has not shown that the court's receipt of the ex parte submissions caused him any prejudice.  His statement that this court "made critical rulings, dismissing [his] failure to warn claims, breach of warranty claims and his negligence claim [against] Bell

---

[23]While the unsealing did not immediately occur as ordered, West did not bring that to the court's attention until the next day, after the case had already gone to the jury.  <u>See</u> Tr. Trans. Sept. 27, a.m., at 30.  So his complaint in his new trial motion that "the ex parte memoranda were not unsealed until September 27, 2013, <u>after</u> the jury was instructed," Mem. Supp. Mot. New Trial at 23 n.22, is not well-taken.

Helicopters [*sic*] while only hearing one side of the story," Mem. Supp. Mot. New Trial at 23, is demonstrably false.

As, again, the court expressly stated in its pre-trial order, the ex parte did not themselves serve as Rule 50 motions, but served only to alert the court to the potential bases for any Rule 50 motions that were eventually made, so that the court could focus on the evidence at trial accordingly.  Tr. Trans. Sept. 26, 2013, a.m., at 8.  The court therefore required the parties to state the grounds for their Rule 50 motions on the record, and gave West the opportunity to object, before the case was submitted to the jury.  Id. at 5-11.  That opportunity followed a one-hour off-the-record charging conference,[24] at which this court heard argument from all parties--including West--as to, inter alia, whether the evidence was sufficient to instruct the jury as to his failure-to-warn and warranty claims against all defendants and his negligence claim against Bell. See Minute Entry of Sept. 26, 2013.

Accordingly, West was aware of the bases of the defendants' challenges to those claims, and had ample opportunity--of which he availed himself--to respond, before the court ruled that, as the defendants had argued, West had failed to adduce sufficient

---

[24]West did not object to holding the charge conference off-the-record, and does not now claim it was improper to do so. Furthermore, the court allowed the parties to put their arguments on the record after the case went to the jury.  See infra n.24.

62

evidence for a rational jury to find in his favor on his claims for breach of the implied warranty of fitness for a particular purpose and failure-to-warn against all defendants and his negligence claim against Bell.[25]  West's suggestion that the court made those rulings without hearing from him is manifestly incorrect (and that is probably the kindest thing that can be said about it).  Because West acquiesced in this court's receipt of ex parte memoranda as to the parties' anticipated Rule 50 motions, and because that procedure caused him no harm in any event, his motion for a new trial on that basis is denied.

### F.   "Declination" to resolve discovery or scheduling disputes

Finally, a footnote in West's new trial motion makes two rather astonishing claims.  First, West asserts that he "was limited in his ability to pursue information about [FOSSA] by the court's declination to rule on a critical motion for protective order," Mem. Supp. Mot. New Trial at 2 n.1, in which the

---

[25]The court also held a dedicated session of oral argument the next day, after the case had gone to the jury, so that the parties "could put their objections on the record" as to the court's jury instructions (the pre-charge conference had occurred off-the-record).  Tr. Trans. Sept. 27, 2013, at 2.  At this session, the defendants re-stated, in some detail, the bases for their Rule 50 motions as to the failure-to-warn and warranty claims, as well as the negligence claim against Bell--claims which, for those reasons, the court had not submitted to the jury--and the court expressly advised West's counsel that, in response, "you can make any argument you want.  It's up to you." Id. at 4-13, 15-20.  Counsel for West took full advantage of that opportunity as well.  Id.

defendants had sought protection against certain of West's discovery requests, see Defs. Jt. Mot. Prot. Order (document no. 92). Indeed, West goes so far as to suggest that the court "refus[ed] to participate in this discovery dispute." Mem. Supp. Mot. New Trial at 2 n.1. Second, West claims that he "was hampered in his ability to prove the occurrence of FOSSA by component testing by the court's declination to weigh in on the parties' dispute as to whether testing [of the components in the ECU involved in his accident] should occur with a corresponding delay in trial." Id. Insofar as these alleged "declinations" are urged as the basis for a new trial, the "argument" is insufficiently developed to warrant attention. See Higgins, 194 F.3d at 260. Nevertheless, this court must point out that the record absolutely refutes any suggestion that it failed or refused to resolve any of the parties' discovery or scheduling disputes, numerous though they were.

As to the defendants' joint motion for protective order, the court simply advised the parties that, because it had "prioritized trials and dispositive motions in other cases requiring more immediate attention," it did "not anticipate an expeditious resolution of their discovery disputes"--which, at that time, included not only those raised in the joint motion for protective order (document no. 93), but also in a total of five other discovery motions filed by West (document nos. 95, 107) and

64

certain defendants individually (doc. nos. 84, 86, 91).  Order of
July 20, 2012.  The court later advised the parties that it had
at that point "undertaken active consideration" of those very
same motions (with the exception of one that had since been
withdrawn).  Order of Jan. 4, 2013.  Less than one month later,
however--when the court was "on the verge of issuing a
comprehensive order resolving all pending motions," Order of Feb.
7, 2013--the parties jointly advised the court that they had
"negotiated an agreement to resolve most of the pending discovery
disputes in the case," including those raised by the defendants'
joint motion for a protective order, which was now moot.  See Jt.
Mot. Clarify Order of Feb. 1, 2013 (doc. no. 130).

West's assertion that the court "refus[ed] to participate"
in the discovery disputes raised by that motion, then, is simply
untrue--as is the notion that this court did anything remotely
improper by advising the parties that other pressing matters
would prevent an immediate resolution of their six voluminously
briefed discovery motions.[26]  Like any other litigant embroiled
in a discovery dispute, West was free to decide whether to await
the court's resolution of it or to negotiate one with the
defendants; with the assistance of his seasoned trial counsel and

---

[26]Among work on other matters, this court was at that time
readying for an expedited bench trial in case seeking relief from
a non-custodial parent's alleged international abduction of a
child under the Hague Convention.  See Thompson v. Gnirk, No. 12-
220 (filed June 12, 2012; tried Aug. 2-3, 2012).

her four junior colleagues, all from one of the premier law firms
in the country, he chose to negotiate a resolution before this
court issued a ruling.  His apparent regret at that decision now
is, obviously, no basis for a new trial, even putting aside the
fact that he makes not the slightest effort to explain how
whatever discovery he might have received in a ruling on the
motion (even it was fully favorable) would have put him in a
better position to win at trial than the discovery he chose to
receive by agreement.

West is also dead wrong that this court "declin[ed] to weigh
in on the parties' dispute as to whether testing [of the
components in the ECU involved in his accident] should occur with
a corresponding delay in trial."  Not only did the court "weigh
in" on that dispute, it decided it, by denying the parties'
competing motions to extend certain of the expert discovery and
challenge deadlines (each of which sought to extend those
deadlines to different dates) in order to accommodate that
testing.  Order of Apr. 11, 2013.  As the court observed, the
parties had recognized the need to perform the testing in late
August 2012, but had not sought the extension of deadlines that
they knew the testing would necessitate until March 18, 2013,
after all of the expert discovery and challenge deadlines had
already expired.  Id. at 2.  Because neither West nor the
defendants made any effort to explain the intervening six months

66

of apparent inaction, this court denied their motions to extend the deadlines for lack of the necessary showing of good cause. Id. at 2-3 (citing Fed. R. Civ. P. 16(b)).

West does not even suggest, let alone attempt to show, that this decision was incorrect; instead, as just noted, he suggests that the court did not even make any such decision.  In any event, the court specifically advised the parties that its decision not to extend the deadlines did not prevent them "from jointly seeking to extend (or, more accurately, resuscitate) the deadlines to dates as to which they are able to agree."  Id. at 3.  The next the court heard from the parties on this matter was by way of a joint motion seeking the approval of a new stipulated scheduling order that, they explained, would extend some of the expert discovery and challenged deadlines without affecting the trial date, "to which all parties wish to adhere."  Jt. Mot. for Third Stip. Sched. Order (document no. 156), at 1.  The joint motion also stated that, under the new stipulated scheduling order, the "defendants will forego motions for summary judgment (and plaintiff will forego unilateral capacitor testing)."  Id. (capitalization omitted; emphasis added).  The court granted this motion.  Order of Apr. 19, 2013.

So, just as West elected to proceed to trial after agreeing to receive narrower discovery about FOSSA than he had originally requested, he likewise elected to proceed to trial after agreeing

67

to forego testing the capacitors from the ECU involved in his accident.  In fact, he agreed to forego that testing in exchange for the defendants' agreement to forego moving for summary judgment.  So any hindrance to West's "ability to prove the occurrence of FOSSA by component testing" was the product of the strategic choices of his counsel, rather than the court's alleged "declination" to resolve the parties' competing motions to revive lapsed deadlines so that such testing could occur (when, in fact, the court ruled on those motions less than a month after they were filed).  West's decision not to test the capacitors in the ECU from his accident, then, cannot serve as the basis of a new trial--putting aside the fact that, as a consequence of that choice, neither he nor the defendants have the slightest idea what that testing would have shown (it may have, of course, conclusively refuted West's theory that a component failure in the ECU had created the FOSSA event that caused his accident).

## III. **Conclusion**

For the foregoing reasons, West's motion for a new trial[27] and his motion for relief from judgment[25] are DENIED.

---

[27]Document no. 349.

[25]Document no. 396.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  September 30, 2014

cc:  Joan A. Lukey, Esq.
     Jesse M. Boodoo, Esq.
     Justin J. Wolosz, Esq.
     Sara Gutierrez Dunn, Esq.
     John P. O'Flanagan, Esq.
     L. Robert Bourgeois, Esq.
     Martha C. Gaythwaite, Esq.
     Brian M. Quirk, Esq.
     James C. Wheat, Esq.
     Jason L. Vincent, Esq.
     Jeffrey H. Karlin, Esq.
     Pierre A. Chabot, Esq.
     Phillip S. Bixby, Esq.
     Marie J. Mueller, Esq.
     R. Matthew Cairns, Esq.

69